## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

PHIL KERPEN, Individually and on Behalf
of All Others Similarly Situated,
  3322 Tennyson St., N.W.
  Washington, D.C. 20015,

CATHY RUSE, Individually and on Behalf
of All Others Similarly Situated,
  11573 Southington Lane
  Herndon, VA 20170,

AUSTIN RUSE, Individually and on Behalf
of All Others Similarly Situated,
  11573 Southington Lane
  Herndon, VA 20170,

CHARLOTTE SELLIER, Individually and on
Behalf of All Others Similarly Situated,
  11561 Southington Lane
  Herndon, VA 20170,

JOEL SELLIER, Individually and on Behalf
of All Others Similarly Situated,
  11561 Southington Lane
  Herndon, VA 20170, and

MICHAEL GINGRAS, Individually and on
Behalf of All Others Similarly Situated,
  37610 Cecilia Lane
  Purcellville, VA 20132,

                Plaintiffs,

    v.

METROPOLITAN WASHINGTON
AIRPORTS AUTHORITY,
  1 Aviation Circle
  Washington, DC 20001,

ANTHONY FOXX, in his official
capacity as SECRETARY OF
TRANSPORTATION,
  1200 New Jersey Avenue, SE
  Washington, DC 20590,

DEPARTMENT OF TRANSPORTATION,
  1200 New Jersey Avenue, SE
  Washington, DC 20590,

                Defendants.

**Civil Action No. 1:16cv1307**

**AMENDED
CLASS ACTION COMPLAINT**

## INTRODUCTION

1.     This is a class action challenging the organization and certain operations of the Defendant Metropolitan Washington Airports Authority ("MWAA"), a putative creation of an interstate compact, and the unprecedented delegation of federal legislative and executive powers to that organization.  Among the relief this case seeks is a declaration that MWAA is not a valid interstate compact entity, that it has been given powers it cannot constitutionally exercise, and that it exercises those powers unfettered by the constitutionally required protections against the unaccountable exercise of government powers.   MWAA employs those powers to illegally exact from the users of Washington Dulles International Airport ("Dulles"), Ronald Reagan Washington National Airport ("Reagan"), and the Dulles Toll Road ("Toll Road") massive subsidies to pay for other facilities and activities not being used by them.

2.     This is the third distinct constitutional challenge to MWAA's structure and the governmental power it exercises.  *See MWAA v. Citizens for the Abatement of Aircraft Noise, Inc.* 501 U.S. 252 (1991) ("*CAAN I*") (concluding that MWAA's Board of Review violated the separation of powers); *Hechinger v. MWAA,* 36 F.3d 97 (D.Cir. 1994) ("*CAAN II*") (concluding that the restructured Board of Review violated the separation of powers).   Unlike the earlier litigation, the issues raised here go to the heart of MWAA's organization and operation and, specifically, whether such an entity can exist within a constitutional regime that is supposed to make the exercise of governmental power accountable to the men and women

subject to it.   As shown below, MWAA is a constitutional anomaly, far outside settled historical practice on interstate compacts and long-accepted bounds on the delegation of federal legislative and executive powers.

3.   Although putatively created by an interstate compact between the Commonwealth of Virginia and the District of Columbia ("District"), MWAA, unlike any other interstate compact entity in history, was created at the command of Congress, under terms dictated by Congress, solely to manage and develop Dulles and Reagan, the only federally owned airports in the country.   Moreover, although MWAA claims to be a creature of an interstate compact, one of the two parties to that putative compact – the District – is not even a State.   And in any event, an interstate compact entity cannot wield the delegated federal power that MWAA exercises.

4.   Most striking from a constitutional perspective, MWAA is structurally insulated from any accountability for the powers delegated to it:  by federal statute it is "independent of Virginia and its local governments, the District, *and* the United States Government."   49 U.S.C. § 49106(a)(2) (emphasis added).   And its organization reflects that independence:  it is led by a seventeen-member board, only three of whose members are appointed or removable by the President. Moreover, the broad federal executive and legislative powers given to MWAA— including the power to exact and spend enormous revenue, the police power, and the power of eminent domain—are uncabined by any intelligible principles articulated by Congress.

5.     Indeed, MWAA wields an almost unlimited power to determine the scope of its own activities.   As long as the Secretary of Transportation goes along, MWAA can make billion-dollar decisions to approve any project or facility, including commercial enterprises, as long as they are "*not inconsistent* with the needs of aviation."   49 U.S.C. § 49104(a)(2)(A)(iv) (emphasis added).   MWAA thus has effectively unbridled discretion to make decisions with enormous economic consequences for the citizens who use the facilities it controls.  And to pay for those facilities and their operations, MWAA can fashion any revenue-generating scheme it desires, going so far as to force one group of citizens to subsidize another group of citizens to the tune of billions of dollars.

6.     MWAA's domain is divided into two "enterprises": the Aviation Enterprise covers the management of the airports, while the Dulles Corridor Enterprise covers facilities and operations within the 400-feet-wide federally owned strip of real estate by which Dulles is connected to rest of the Washington, D.C. metropolitan area (the "Dulles Corridor").   As part of the Dulles Corridor Enterprise, MWAA manages both the Dulles Access Highway ("Access Highway"), which provides the exclusive access for vehicles to Dulles, and the Dulles Toll Road ("Toll Road"), which was expressly built to handle local traffic *not* going to Dulles. MWAA is also in charge of the Dulles Corridor Metrorail Project ("Metrorail Project")—one of the largest and most complex transportation projects in the United States—which involves construction of the Silver Line to serve Northern Virginia, Dulles, and the Washington, D.C. metropolitan region.

7.     With its expansive powers, MWAA engages in or spends enormous resources on activities not focused on aviation or even the Dulles Corridor.  For example, MWAA has committed approximately $30 million to the Virginia Department of Transportation to widen and improve State Route 606 in Loudoun County, Virginia.   MWAA has also expanded maintenance facilities for rail cars used by a different agency – the Washington Metropolitan Area Transit Authority (WMATA) – on lines other than the Silver Line.  MWAA is also procuring rail cars for WMATA to be used on lines other than the Silver Line.   And MWAA has established a real estate management and marketing program to develop land under its control but not needed for the airports or the Metrorail Project.

8.     MWAA generates revenue to support the Aviation Enterprise through aircraft landing fees, rents and revenues from concessions (especially parking), and passenger facility charges and other fees tacked onto airline ticket prices.  MWAA generates revenue to support the Dulles Corridor Enterprise and its other unrelated activities by its exactions from users of Reagan, Dulles, and the Toll Road.  MWAA is thereby exacting a massive illegal subsidy—in excess of $3 billion—from users of public facilities to pay for other facilities they are obviously not using.  The Class members represented by Plaintiffs include the users of the airports and the Toll Road from whom this money has been and is being illegally exacted.

9.     This lawsuit seeks to remedy these and other violations of federal law through declaratory and injunctive relief that will put a halt to MWAA's unlawful actions.  It also seeks monetary relief that will provide restitution to the hundreds

of thousands of Class members who have already been harmed by MWAA's exercise of unaccountable government authority, delegated in disregard of the Constitution's structural norms.

10.     At the same time, this lawsuit does not take a position on the value of the development of the airports or the Metrorail Project.  Nor does this lawsuit ask the Court to determine whether any or all of these activities has enough value to justify their massive costs.  Rather, what animates this lawsuit is Justice Holmes' famous admonition that "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416 (1922).

## JURISDICTION AND VENUE

11.     The Court has jurisdiction under 28 U.S.C. § 1331 to enter injunctive relief, to order restitution, and to secure any other appropriate equitable relief because the action arises under the United States Constitution and federal law.

12.     The Court may enter declaratory relief under 28 U.S.C. § 2201.

13.     The Court has jurisdiction under 28 U.S.C. § 1343(a) to enter injunctive relief, to order restitution, and to secure any other equitable relief to which Plaintiffs are entitled to redress the deprivation of their constitutional and federal rights secured by 42 U.S.C. § 1983.

14.     The Court has jurisdiction under 49 U.S.C. § 49104(c) to compel MWAA to comply with the terms of the lease between MWAA and the Secretary of Transportation concerning the Metropolitan Washington Airports.

15.     Venue is proper under 28 U.S.C. § 1391(b) and (c) because MWAA is located in this judicial district; a substantial part of the events or omissions giving rise to this action occurred in this judicial district; and MWAA, an entity subject to sue and be sued in its common name under applicable law, is subject to this Court's personal jurisdiction with respect to the civil action in question.

16.     Venue is also proper under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States; the Secretary of Transportation performs his official duties in this judicial district; and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## PARTIES

17.     Plaintiff Phil Kerpen is a resident of Washington, D.C.  He has used, and continues to use, both Reagan and Dulles, and the parking facilities at those airports.  He also has used, and continues to use, the Dulles Toll Road for a variety of purposes.  He pays tolls in cash.

18.     Plaintiff Cathy Ruse is a resident of Herndon, Virginia.  She has used, and continues to use, both Reagan and Dulles, and the parking facilities at those airports.  She also has used, and continues to use, the Dulles Toll Road for a variety of purposes.  She pays tolls via transponder.

19.     Plaintiff Austin Ruse is a resident of Herndon, Virginia.  He has used, and continues to use, both Reagan and Dulles, and the parking facilities at those airports.  He also has used, and continues to use, the Dulles Toll Road for a variety of purposes.  He pays tolls via transponder.

20.     Plaintiff Charlotte Sellier is a resident of Herndon, Virginia.  She has used, and continues to use, both Reagan and Dulles, and the parking facilities at those airports.  She also has used, and continues to use, the Dulles Toll Road for a variety of purposes.  She pays tolls via transponder.

21.     Plaintiff Joel Sellier is a resident of Herndon, Virginia.  He has used, and continues to use, both Reagan and Dulles, and the parking facilities at those airports.  He also has used, and continues to use, the Dulles Toll Road for a variety of purposes.  He pays tolls via transponder.

22.     Plaintiff Michael Gingras is a resident of Purcellville, Virginia.  He has used, and continues to use, both Reagan and Dulles, and the parking facilities at those airports.  He also has used, and continues to use, the Dulles Toll Road for a variety of purposes.  He pays tolls via transponder.

23.     Defendant Metropolitan Washington Airports Authority ("MWAA") is a public body created and given authority by legislative action of Virginia, the District, and Congress. *See* D.C. Code §§ 9-901—9-926; Va. Code §§ 5.1—5.1-163; 49 U.S.C. §§ 49101-49112.  By federal statute, MWAA is "independent of Virginia and its local governments, the District, and the United States Government." 49 U.S.C. § 49106(a)(2).  It is "a political subdivision constituted only to operate and improve

7

the Metropolitan Washington Airports as primary airports serving the Metropolitan Washington area." *Id.* § 49106(a)(3).  MWAA is located at 1 Aviation Circle, Washington, DC 20001, a D.C. address near Reagan Airport, on the Virginia side of the D.C.-Virginia border.

24.   Defendant Anthony Foxx ("Secretary") is sued in his official capacity as Secretary of the U.S. Department of Transportation ("Department").  The Secretary is the federal official ultimately responsible for the Department's actions and operations.   Among other duties, the Secretary is required by federal law to determine whether real property leased to MWAA is used for "airport purposes," and is authorized to order MWAA to use leased property for such purposes or to retake possession of that property in the event of MWAA's failure to do so. 49 U.S.C. § 49104(a)(2)(C).

25.   Defendant Department is an executive agency of the United States Government located at 1200 New Jersey Avenue, SE, Washington, DC 20590.

## COMMON SUBSTANTIVE ALLEGATIONS

## I.   The Creation of a Constitutional Anomaly.

26.   Reagan and Dulles are two major airports serving the D.C. metropolitan area.  Both airports are owned by the federal government, and until 1987 both were under the direct control of the Federal Aviation Administration ("FAA"), which had a track record of "profitable operation" and "excellent management."  *CAAN,* 501 U.S. at 257.  MWAA was created not to remedy some problem with the FAA's management of the airports, but as a way to circumvent the

normal appropriations process which, because of the constraints of the federal budget, could not fund all the improvements at Reagan and Dulles desired by members of Congress.

27.     The problem was "solved" in 1984, when an advisory commission convened by then-Transportation Secretary Elizabeth Dole recommended that operation of Washington National and Dulles airports be transferred to an "independent authority to be created by Virginia and the District," which could then raise the needed money by selling tax-exempt bonds. *See CAAN,* 501 U.S. at 257 & n.3.

28.     In response, Virginia and D.C. enacted virtually identical legislation in 1985 creating MWAA as a "public body corporate and politic" which is "independent of the Commonwealth [of Virginia] and its local political subdivisions, the District, and the federal government." *See generally* 1985 Va. Acts. ch. 598; Va. Code §§5.1-152—5.1-163; 1985 D.C. Law 6-67; D.C. Code §§ 9-901—9-926. Congress consented in advance to this putative interstate compact between Virginia and D.C. by the operation of the Act of Aug. 11, 1959, Pub. L. No. 86-154, 73 Stat. 333 (1959) (now codified as amended at 49 U.S.C. § 40124).

29.     After Virginia and D.C. enacted their legislation establishing their putative interstate compact, Congress also enacted the Metropolitan Washington Airports Act of 1986, ("Transfer Act") (currently codified at 49 U.S.C. §§ 49101-49112). The Transfer Act specified MWAA's necessary attributes and authority, and the terms under which MWAA must exercise that authority.

30.     Some of those federal specifications in the current version of the

Transfer Act:

a. require that MWAA be "independent of Virginia and its local governments, the District of Columbia, and the United States Government" (§49106(a)(2));

b. provide that MWAA be "constituted only to operate and improve the Metropolitan Washington Airports" (§49106(a)(3));

c. set forth which functions MWAA "shall be authorized" to perform, such as issuing bonds, acquiring property, and "levy[ing] fees or other charges" (§49106(b)(1)(A)-(F));

d. require that MWAA have a 17-member Board appointed as follows: 7 members by the Virginia Governor, 4 by the D.C. Mayor, 3 by the Maryland Governor, and 3 by "the President with the advice and consent of the Senate" (§49106(c)(1)(A)-(D));

e. provide that Board members may be removed only for cause by the official who appointed them (§49106(c)(6)(C));

f. authorize and require MWAA to take certain actions by regulation (§49106(e));

g. define the terms of MWAA's lease of  the airports (§49104);

h. restrict MWAA's use of airport property to "airport purposes," but defining those purposes to include any "business or activity not inconsistent the needs of aviation" (§49104(a)(2)(A)(iv), (B)),

i. authorize MWAA to exercise the power of eminent domain (§49106(b)(1)(D);

j. authorize MWAA to exercise police powers through a "regular police force" (§49111(c); and

k. empower the Secretary to determine whether MWAA's use of the leased property constitutes an approved "airport purpose," defined as "a business or activity not inconsistent with the needs of aviation." (§49104(a)(2)(A)(iv) & (C)).

31.     The Virginia and D.C. legislation faithfully included these federal

specifications.

32.     The original Transfer Act also included a specification not in the 1985

Virginia and D.C. legislation – a provision for a Board of Review composed of

members of Congress designed to address congressional "concern" over a complete "surrender of federal control" over the airports.  *See CAAN,* 501 U.S. at 258-59; Transfer Act §6007(f).  The MWAA Board of Directors was required to submit certain core actions to the Board of Review for approval, including the adoption of MWAA's budget, the authorization of bonds, the promulgation of regulations, the adoption of a master plan, and the appointment of MWAA's chief executive officer. In this way Congress provided a measure of political accountability – albeit constitutionally flawed – for the operations of the otherwise absolutely independent MWAA.

33.   The Transfer Act also included a special "Limitation on Authority" providing that, if the Board of Review was declared unconstitutional, MWAA would "have no authority to perform any of the actions that are required ... to be submitted to the Board of Review."  Transfer Act, §6007(h).

34.   In March, 1987, the transfer of the Washington National and Dulles airport properties to MWAA was effected, as required by the Transfer Act, by the execution of a 50-year lease between the Secretary (on behalf of the Federal Government) and MWAA, which included all of the specifications of the Transfer Act.  *See* Lease of the Metropolitan Washington Airports between the United States of America acting by and through the Secretary of Transportation and the Metropolitan Washington Airports Authority (March 2, 1987) (the "Airports Lease"), *available at* http://www.mwaa.com/sites/default/files/archive/mwaa.com/file/MWAA_

Lease_with_Federal_Government.Including_Amendment_4.pdf.  In 2003, the lease was extended by an additional 30 years to 2067.

35.    After the Airports Lease was executed, the MWAA Board of Directors adopted by-laws providing for the Board of Review.  Virginia and D.C. amended their legislation to authorize MWAA to establish the Board of Review required by the Transfer Act.

36.    In 1991, the Supreme Court struck down the Board of Review mechanism, concluding that it constituted an "impermissible encroachment" on the separation of powers.  *CAAN,* 501 U.S. at 275-77.  Within six months, Congress reconfigured MWAA and the Board of Review to try to pass constitutional muster.  In addition, the 1991 Amendments expanded the Board of Review's control of MWAA's operations, and once again commanded that MWAA could not take any actions subject to Board of Review approval until the MWAA Board of Directors established the new Board of Review.

37.    The reconfigured MWAA was promptly challenged in court and again failed to pass constitutional muster on separation of powers grounds.  *CAAN II,* 36 F.3d at 105.

38.    After the demise of the Board of Review, Congress took no further action to provide any means for federal oversight of MWAA in compliance with the structural requirements of the Constitution.  Consequently, the power to govern MWAA and to exercise the federal powers delegated to MWAA by the Transfer Act

devolved upon the independent discretion of MWAA's Board of Directors, where it remains today.

39.     In addition to the two federally owned airports themselves, one of the most important federal assets subject to the Board's authority is the Dulles Corridor, which contains the approximately 14-mile long Access Highway linking Dulles with the Capital Beltway and Interstate Route I-66, and on which most of the Metrorail Project is located.   The same federal statute that authorized construction of Dulles also authorized construction of the Access Highway.  By law, motorists may use the Access Highway only for traveling to and from the airport.

40.     In 1983, the federal government granted an easement to the Commonwealth of Virginia over a portion of the Dulles Corridor.  On this easement, the Virginia Department of Transportation ("VDOT") built the Toll Road, an approximately 14-mile toll highway that runs along both sides of the Access Highway and then past Dulles into Loudoun County, Virginia.  The purpose of the Toll Road was to accommodate increasing non-airport traffic in the area, without compromising the Access Highway's dedicated role as the sole artery for airport traffic to and from Dulles.  VDOT began operating the Toll Road in 1984.

41.     Construction of the Toll Road was financed using Transportation Facilities Bonds issued by Virginia, which have been paid off in full by the tolls paid by Toll Road users.

## II.     MWAA's Exercise of Federal Power Over Its "Enterprises."

42.     Pursuant to the command of the Transfer Act, the Airports Lease leases to MWAA Reagan and Dulles, which includes the airports, the Dulles

Corridor, and all facilities, easements, and rights of way within the Corridor, such as the Access Highway. The Transfer Act also requires that the leased property be used "only for airport purposes."  49 U.S.C. § 49104(a)(2)(B).

43.    Pursuant to the command of the Transfer Act, the Airports Lease defines "airport purposes" to mean "a use of property interests (except a sale)" for:

    (i)     aviation business or activities;
    (ii)    activities necessary or appropriate to serve passengers or cargo in air commerce;
    (iii)   nonprofit, public facilities that are not inconsistent with the needs of aviation; *or*
    (iv)   a business or activity *not inconsistent* with the needs of aviation that has been approved by the Secretary.

44.    The Transfer Act provides that "[i]f the Secretary decides that any part of the real property leased to [MWAA] … is used for other than airport purposes … the Secretary shall … retake possession of the property[.]"   49 U.S.C. § 49104(a)(2)(C).

45.    The Airports Lease includes a provision by which a "certificate" may be sought from the Secretary to confirm that MWAA is "not in default in the performance of any covenant, agreement or condition contained in this lease."

46.    The issuance of this certificate is initiated by a "written notice" from MWAA.

47.    This certificate simply serves to protect "any lender, bond holder, trustee or other person proposing to enter into agreements" with MWAA from the Secretary taking a position inconsistent with that certificate.

48.     Neither the Transfer Act nor the Airports Lease creates any mechanism or procedure by which the Secretary is in a position to effectively supervise MWAA, or otherwise to practically enforce the Lease terms.  This is fully consistent with the Transfer Act's mandate that MWAA be "independent" from "the United States Government."

49.     At bottom, while MWAA may use the property entrusted to it only for "airport purposes," that is a vague standard that has been shown to be extraordinarily elastic.  Indeed, it has been construed by MWAA and the Secretary to allow MWAA to assume complete control over a road designed *not* to serve any airport – Virginia's Toll Road.

50.     To make matters worse, by virtue of amendments enacted in 2012, the Transfer Act now simply provides that MWAA can engage in any "business or activity" that is not "inconsistent" with the "needs of aviation."   49 U.S.C. § 49104(a)(2)(A)(iv).   Within that near limitless parameter, MWAA now has the prerogative to wield federal power in pursuit of its own unfettered view of the general welfare (or simply its own welfare) within the Aviation and Dulles Corridor Enterprises, including altering the rights and duties of the users of facilities within those Enterprises.

51.     MWAA generates revenue for the Aviation Enterprise exclusively from fees and charges set according to the discretion of MWAA's Board and exacted from users of the airports, whether passengers, airlines, or other vendors and support operations.   Plaintiffs and Class Members included in this group of users are

primarily airline passengers and others taking passengers to, or picking them up from, the airports.

52.     MWAA generates revenue for the Dulles Corridor Enterprise from fees and charges set according to the discretion of MWAA's Board and exacted from users of the Toll Road, who include Plaintiffs and the Class Members.  In addition, passenger facility charges exacted from airline passengers using facilities within the Aviation Enterprise, who include Plaintiffs and the Class Members, are used to provide revenue for facilities and activities within the Dulles Corridor Enterprise.

53.     Thus the right of any person to use the putatively public facilities within the Enterprises run by MWAA is conditioned on the payment of money at levels determined by MWAA to be used for facilities or activities chosen by MWAA, whether or not those facilities or activities currently exist or are future initiatives planned by MWAA, and whether or not the person paying this money is using those facilities or benefiting from those activities.  MWAA in this way exercises the prerogative to use governmental power to compel one group of persons to subsidize facilities or activities used by others.

54.     MWAA's prerogative to use governmental power to operate public facilities, to choose which public facilities will be built, and to exact and expend money in this manner is a legislative power or, alternatively, an executive power under the United States Constitution.

55.     To the extent that the Secretary has endorsed or acquiesced in MWAA's actions, he has participated in or abetted the exercise of such legislative or executive power.

56.     The practical extent of MWAA's legally unlimited prerogatives to exercise legislative or executive power is illustrated by the initiatives it has undertaken in, or funded by exactions from, the Dulles Corridor Enterprise.

57.     A hallmark of these initiatives is the use of Toll Road revenues to subsidize other facilities or activities favored by MWAA.

58.     Thus (for example) MWAA has committed approximately $30 million to VDOT to widen and improve State Route 606 in Loudoun County, Virginia.

59.     With revenues exacted from Toll Road users, MWAA has also funded the expansion of its maintenance yard in West Falls Church and constructed a similar facility at Dulles to provide maintenance and repair services to rail cars owned by WMATA and used on rail lines other than the Metrorail Project's Silver Line.

60.     MWAA is also undertaking the procurement of rail cars for WMATA to be used on lines other than the Silver Line and funding the purchases with revenues exacted from Toll Road users.

61.     MWAA has also established a real estate management and marketing program to develop land under its control that is not devoted to or necessary for the two airports that MWAA operates, again relying on money exacted from Toll Road users to pay for these commercial initiatives.

62.     MWAA's most significant and publicly well-documented venture has been its initiative to take over operation of the Toll Road from VDOT and "harness the revenue stream from the Toll Road" in order to finance construction of the Metrorail Project.

63.     In 2008, MWAA took control of the Toll Road pursuant to the Dulles Toll Road Permit and Operating Agreement MWAA had entered with VDOT. Through this deal with VDOT, MWAA obtained the exclusive authority, wholly independent of VDOT, to operate the Toll Road and set, charge and collect tolls in consideration for MWAA's obligation to fund and construct the Metrorail Project.

64.     In October 2008, the Secretary issued a certificate representing that MWAA's operation of the Toll Road and its use of toll revenue to fund construction of the Metrorail Project were valid "airport purposes."

65.     To fulfill its commitment to use Toll Road revenues to help pay for the Metrorail Project, in the four years from 2010 to 2014 MWAA nearly tripled the overall one-way tolls for a 2-axle vehicle from $1.25 to $3.50, as set out below:

| Toll Rate History: 2-axle Vehicle Tolls By Calendar Year | | |
|---|---|---|
| Year | At the Main Toll Plaza | At the On/Off Ramps |
| 2014 | $2.50 | $1.00 |
| 2013 | $1.75 | $1.00 |
| 2012 | $1.50 | $.75 |
| 2011 | $1.25 | $.75 |
| 2010 | $1.00 | $.75 |
| 2005 | $0.75 | $0.50 |
| 1984 | $0.50 | $0.25 ($0.35 at Route 28) |

66. MWAA has projected that toll rates will only go up, with Main Toll Plaza rates increasing to $3.25 by 2019, to $4.00 by 2023, and on up to $7.75 by 2048.

67. To pay for the ever-increasing costs of the Metrorail Project, larger and larger percentages of rising toll revenues are being devoted to subsidize the Metrorail Project. Most recently, MWAA has estimated that $2.82 billion in tolls will be spent on the Metrorail Project, paying for nearly 50 percent of its costs, and another $235 million will come from the Aviation Enterprise, as the following MWAA chart shows:

## Rail Project Costs are allocated in accordance with funding agreements

| SOURCES OF CAPITAL FUNDS $ Millions | PHASE 1 | PHASE 2 [1] | RAIL PROJECT BUDGET prior to NVTA funding | | RAIL PROJECT BUDGET after NVTA funding | |
|---|---|---|---|---|---|---|
| | | | Total | % of Total | Change | Total |
| Federal | $ 900 | $ - | $ 900 | 15.6% | | $ 900 |
| Commonwealth of Virginia [2] | 252 | 323 | 575 | 10.0% | | 575 |
| Northern Virginia Transportation Authority [3] | | - | - | 0.0% | 33.0 | 33 |
| Fairfax County | 400 | 527 | 927 | 16.1% | (5.3) | 922 |
| Loudoun County | | 276 | 276 | 4.8% | (1.6) | 275 |
| MWAA (Aviation Funds) | | 236 | 236 | 4.1% | (1.4) | 235 |
| MWAA (Dulles Toll Road) | $ 1,430 | $ 1,415 | $ 2,845 | 49.4% | (24.8) | $ 2,820 |
| TOTAL SOURCES OF FUNDS | $ 2,982 | $ 2,778 [4] | $ 5,760 | 100.0% | $ - | $ 5,760 |

Fixed Amount
Fixed Percentage of total cost
Residual

(1) Phase 2 Parking Garages are to be funded directly by the Counties and are not included in the Total Rail Project Budget.
(2) Does not include $150 million from the Commonwealth that is being used to pay interest on Dulles Toll Road revenue bonds.
(3) NVTA grant can only be used to pay or reimburse capital costs for Innovation Center Metrorail Station.
(4) Phase 2 Costs include $551 million in initially unallocated contingency.

This amounts to a subsidy of well over $3 billion.

68. Indeed, MWAA reported that 61 percent of the $149 million in estimated toll revenue in 2014 would be devoted to subsidizing the Metrorail

Project, with only 21 percent of that sum going to the operation and maintenance of the Toll Road.

69.    Although the Secretary has limited authority to investigate and order the investigation of the disposition of federal funds, whether by a federal instrumentality, a state, a local government or a nongovernmental entity, he has not been assigned general supervisory authority over such entities, including MWAA, to direct and control their actions.   After all, by statute MWAA is "independent" of all governments – federal, state and local.   The absence of general supervisory authority over MWAA in any federal executive officer means that MWAA is not subject to the required constitutional control contemplated by Article II, Section 2, which has led to predictable mismanagement, corruption, and self-dealing.

70.    In the face of MWAA's independence, the top leadership of the United States Department of Transportation ("DOT") has nevertheless recognized that MWAA is a "public body" that manages "vitally important Federal assets."   Joint Finance and Dulles Corridor Committees, *Adoption of Amendment to the Regulation Establishing Toll Rates on the Dulles Toll Road*, at 8 (Oct. 17, 2012), *available at* http://archive.mwaa.com/file/Tab_E-1__Recommendation_Paper_on_ the_Adoption_of_the_Amendment_to_the_Regulation_Establishing_Toll_Rates_on_t he_Dulles_Toll_Road.pdf.

71.    MWAA has been the subject of repeated investigations by the U.S. Department of Transportation because of MWAA's questionable procurement

20

practices, mismanagement, waste, and general lack of accountability. Those investigations also highlight MWAA's exercise of federal power.

72.    For instance, in July 2012, U.S. Secretary of Transportation Ray LaHood sent a letter to MWAA demanding that MWAA open its books and records to the USDOT Inspector General.  Letter from Ray LaHood to Michael A. Curto and John      E.      Potter,      Jul.      31,      2012,      *available      at* http://www.metwashairports.com/sites/default/files/archive/mwaa.com/file/LaHood. Curto_7.31.12.pdf.  Secretary LaHood explained that MWAA is a "public body" that operates "Federal interests."    *Id.* at 1. The Secretary's letter noted "significant concerns about MWAA's policies and procedures in contracting, ethics, and travel," and its "lack of transparency and accountability" implicates significant "Federal interests."

73.    In November 2012 DOT's Inspector General reported that "MWAA's ambiguous policies and ineffectual controls" in "its management of two of the Nation's largest airports and a multibillion-dollar public transit construction project … put these assets and millions of Federal dollars at significant risk of fraud, waste, and abuse."

74.    In 2014, the DOT Inspector General found that MWAA's spending of federal funding for the Dulles Metrorail Project included both "unsupported and unallowable costs."  Unsupported costs have totaled about 36 percent of federal funding for the Metrorail Project, or some $139 million. And unallowable costs— such as spending on lobbyists—have totaled an additional $350,000.

75.     The Inspector General has also found MWAA's contracting practices, including contracts for the Metrorail Project, to be anti-competitive and unethical. USDOT Office of the Inspector General Audit Report, *MWAA's Weak Policies and Procedures Have Led to Questionable Procurement Practices, Mismanagement, and A Lack of Overall Accountability* 2 (2012).

76.     In short, not only are the users of Reagan, Dulles, and the Toll Road being required to subsidize eventual customers of the Metrorail Project and to pay for other activities unrelated to the airports and the Toll Road, but those users are also being required to pay even larger subsidies than they would if MWAA were managed in a competent, ethical manner.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and/or (b)(1), (b)(2), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, predominance, and superiority requirements of those provisions.

78.     The proposed Classes are defined as:

### Nationwide Class

All persons or entities in the United States who used the facilities located on or within the premises leased to MWAA under the Airports Lease and from whom MWAA has exacted a fee, charge, toll or similar payment from November 2008 to the present.

### Dulles Corridor Enterprise Subclass

All persons or entities in the Nationwide Class who paid tolls to MWAA for the use of the Toll Road from November 2008 to the present.

### Aviation Enterprise Subclass

All persons or entities in the Nationwide Class who paid a fee, charge, or similar payment exacted in whole or in part by MWAA for the use of facilities at Reagan or Dulles from November 2008 to the present.

79.     Excluded from the Classes are (A) all Defendants and their officers, directors, employees, agents, and legal representatives; (B) all airline companies who provide service at Reagan or Dulles; and (C) the Judge to whom this case is assigned and the Judge's staff.  Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

### Numerosity and Ascertainability

80.     Although the exact number of Class members is uncertain, the size of the Classes can be estimated with reasonable precision, and the number is great enough that joinder is impracticable.

81.     According to MWAA statistics, between 95 million and 105 million transactions take place on the Dulles Toll Road each year.  This means that, over the period since MWAA began managing the Toll Road, more than 700 million transactions have taken place.

82.     Furthermore, the identities of the Class and Subclasses can be reasonably identified through information in the possession of MWAA, its agents, and governmental agencies, or alternatively through publication.

83.     With respect to the Dulles Corridor Subclass, approximately 85 percent of the tolls collected on the Dulles Toll Road are paid via an electronic transponder system such as "EZ-Pass." There are more than 900,000 active E-Z Pass transponders issued by VDOT alone. The identity and contact information of each member of the Transponder Subclass can be readily determined from personal data maintained by MWAA, VDOT, and governmental agencies in other states who issue similar transponders.

84.     With respect to members of the Dulles Corridor Subclass who pay tolls with cash, on information and belief MWAA tracks every car that passes through toll plazas and has the ability to ascertain the license plate numbers of virtually all of its customers who paid cash.  Moreover, those customers who have paid with cash can be found by publication as well.  Finally, many of these customers may have independent records confirming their use of the Toll Road.

85.     With respect to the Aviation Enterprise Subclass, on information and belief the great majority of the exactions by which this Subclass is in part defined are imposed through passenger facility charges added to the ticket of each airline passenger.  Records of the purchasers of airline tickets are in the possession, custody, or control of MWAA or accessible to it from the airlines or other sources.

86.    In sum, the number of Class members is likely in the hundreds of thousands, and the disposition of the Class members' claims in a single action will provide substantial benefits to all parties and to the Court.   Class members are readily identifiable from information and records in the possession, custody, or control of MWAA, governmental agencies such as VDOT, and the Class members themselves.   Class members are also identifiable through publication.

## Typicality

87.    The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all Class members, have used both Reagan and Dulles and have used the Toll Road since MWAA began operating it November 2008.   As a result, Plaintiffs have suffered the unauthorized and illegal exactions by MWAA inflicted on all Class members.

## Adequate Representation

88.    Plaintiffs are members of the Classes and will fairly and adequately represent and protect the interests of the Classes.   Plaintiffs' counsel have substantial experience in litigating complex issues of constitutional and administrative law both on behalf of, and against, governmental entities.   Plaintiffs' counsel also have substantial experience in class action litigation.

89.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests in conflict with that of the interests of the Classes.

## Predominance of Common Issues

90.     There are numerous issues of law and fact common to Plaintiffs and Class members that predominate over any issue affecting only individual Class members. Resolving these common issues will advance resolution of the litigation as to all Class members. These common legal and factual issues include, for example:

a.  whether MWAA is a valid interstate compact entity under the Compact Clause;

b.  whether MWAA's exercise of legislative and executive power violates the separation of powers required by the United States Constitution;

c.  whether Congress unconstitutionally delegated legislative and regulatory authority to MWAA;

d.  whether MWAA has exacted money from Class members in violation of the Due Process Clause of the Fifth Amendment;

e.  whether MWAA and/or the Secretary have acted in violation of the Transfer Act and/or the Lease;

f.  whether MWAA and/or the Secretary have acted in violation of the Administrative Procedure Act; and

g.  whether the subsidization of the improvements to State Route 606, the expansion and construction of maintenance yards for rail cars not used on the Silver Line, the procurement of rail cars for WMATA that will not be used on the Silver Line, a real estate management and

marketing program, and the construction of the Silver Line is an "airport purpose" under the Airports Act and under the Airports Lease.

### Superiority

91.     Plaintiffs and Class members have all suffered—and will continue to suffer—harm as a result of MWAA's unlawful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

92.     Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that few, if any, Class members could afford to seek legal redress for MWAA's misconduct.  Absent a class action, the harms to Class members will go unremedied, and MWAA's misconduct will continue without remedy.

93.     Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

94.     MWAA has acted in a uniform manner with respect to the Plaintiffs and Class members.

95.     Classwide, declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because MWAA has acted on grounds that apply generally to the class, and inconsistent adjudications with respect to MWAA's liability would establish incompatible standards and substantially impair or impede

the ability of Class members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in the adjudication of the constitutionality of MWAA's structure and delegated powers.

## CLAIMS FOR RELIEF

**Count One: Compact Clause –District of Columbia Not a State**
**(Against All Defendants)**
**Because MWAA is not a valid interstate compact entity, it lacks authority**
**to force the Plaintiff class to subsidize facilities and activities not being**
**used by them**.

96.     Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

97.     The Compact Clause of the United States Constitution provides that "[n]o State shall, without the Consent of Congress,  . . . enter into any Agreement or Compact with another State[.]"  U.S. Const. art. I, § 10, cl. 3.  The Clause requires "an agreement among sovereign States," *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010), to which Congress gives its consent.

98.     MWAA purports to derive its authority from an interstate compact between the District and Virginia, to which it claims Congress has consented under the Compact Clause.  More specifically, MWAA has sought to justify its authority to manage the Aviation and Dulles Corridor Enterprises—including its purported authority to force the users of Reagan, Dulles, or the Toll Road to subsidize the costs of a variety of other facilities and activities they are not using—by relying on its alleged status as a congressionally-approved interstate compact entity under the Compact Clause.

99.     MWAA, however, is not a valid interstate compact entity under the Compact Clause.  The District—one of the two government entities purporting to form the compact creating MWAA—is not a "State" for purposes of the Compact Clause.  *See, e.g., Adams v. Clinton*, 90 F.Supp. 2d. 35, 47-50 (D.D.C. 2000)

(Garland, J.) (concluding that the District is not a "State" for purposes of Article I); *District of Columbia v. Carter*, 409 U.S. 418, 432 (1973) (explaining that the District is "truly *sui generis* in our governmental structure" and holding that the District is not a "State or Territory" for purposes of 42 U.S.C. § 1983). Because the District is not a State, an arrangement between it and Virginia cannot be approved or exercise any authority pursuant to the Compact Clause.

100. The inapplicability of the Compact Clause to the District is not simply a matter of nomenclature. Unlike a State, the District is not a sovereign within our constitutional order. Instead, in contrast to a sovereign State, the District is an entity to whom executive and legislative powers have been delegated by Congress. *See* D.C. Code §§ 1-203.02, 1-204.22. Because the District exercises executive and legislative powers solely because those powers have been delegated to it, and not as an attribute of its own sovereignty, the District cannot in turn delegate, or agree to delegate, any executive or legislative powers to any other entity, contrary to MWAA's claims about its own authority.

101. Moreover, the statute by which Congress has expressed its consent to interstate compacts regarding the operation of airports, 49 U.S.C. § 40124, reflects the underlying premise of the Compact Clause, expressly stating that the "Congress consents to a *State* making an agreement … with another *State* to develop or operate an airport facility." (Emphases added.) As a non-State, the District falls outside this statute as well.

102.    Because MWAA is not a valid interstate compact entity and has no authority under the Compact Clause, MWAA has no legitimate constitutional existence as a governmental body.  As a result, Congress could not and cannot validly delegate to MWAA the federal powers MWAA has purported to exercise in its management of the Aviation and Dulles Corridor Enterprises.

103.    Similarly, the Secretary did not have the constitutional authority to transfer federal property, specifically the premises of Reagan and Dulles as defined in 49 U.S.C. § 49103, to a non-compact entity like MWAA, and thereby subject users of Reagan, Dulles, and the Toll Road to the federal powers MWAA claims to exercise.

104.    MWAA's purported exercise of federal power to compel persons using Reagan, Dulles, or the Toll Road to subsidize at MWAA's discretion public facilities not being used by those persons, or to subsidize activities in which those persons are not participating, is therefore without legal authority and should be set aside; restitution should be made for those subsidies; and the Secretary should retake possession of the premises leased to MWAA under the Airports Lease.

### Count Two: Compact Clause – Federalism Violations
#### (Against All Defendants)
**Federal authority may not be delegated to even a valid interstate compact entity.**

105.    Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

106.   Even if MWAA were a proper Compact Clause entity, Congress has made an unprecedented delegation to MWAA of significant federal authority not appropriate for such an entity.

107.   First, the constitutional purpose of an interstate compact, and any entity created by one, is to "address interests and problems that do not coincide nicely either with the national boundaries or with State lines." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40 (1994) (internal quotation marks omitted). Thus, compacts are fashioned to establish "regional solutions" to "regional problems." Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 YALE L.J. 685, 708 (1925).

108.   MWAA, in stark contrast, was created at the instigation of Congress to address a distinctively congressional need: to get non-federal dollars to develop Reagan and Dulles Airports while maintaining some congressional control over them.  *See CAAN*, 501 U.S. at 257 n.3.  No regional concern motivated MWAA's creation, for there was "no question that the daily management of the airports by the . . . FAA ha[d] been excellent." *Id.* (quoting S.Rep. No. 99-193, p. 2 (1985)). Indeed, Congress staunchly resisted simply selling the airports to another governmental or private entity.  As the Supreme Court has underscored, "the Federal Government has a strong and continuing interest in the efficient operation of the airports, which are vital to the smooth conduct of Government business, especially to the work of Congress[.]" *CAAN*, 501 U.S. at 266.   In fact, the agreement creating MWAA is more accurately characterized as an agreement

between Virginia and the United States, an agreement which by definition is not an interstate compact.

109.   Second, even with Congressional approval, a Compact Clause entity is still necessarily a creature of the state governments that created it.   As the Supreme Court has repeatedly emphasized, the federal Constitution contemplates a careful "vertical" division and demarcation of powers between the federal and state levels.   *See, e.g., Alden v. Maine,* 527 U.S. 706 (1999).   For that reason, the federal government cannot "commandeer" State instrumentalities in implementing federal programs, even with a State's consent.   *See, e.g., Printz v. United States,* 521 U.S. 898, 916, 925 (1997).   By the same token, the federal government cannot delegate to the States the authority to exercise federal powers.   *See, e.g., Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149 (1920) (Congress cannot authorize states to apply their workmen's compensation laws to maritime workers, in light of federal authority over maritime matters); *Washington v. W. C. Dawson* & Co., 264 U.S. 219 (1924) (same).   Accordingly, to preserve the required separation between federal and state power and authority, Congress may not confer federal power and authority on a Compact Clause entity—which, again, is not a federal entity, but rather a creature of the State governments forming the compact.

110.   Because the federal authority delegated to MWAA is improper under the Compact Clause, MWAA's authority to manage the Aviation and Dulles Corridor Enterprises—including its purported authority to force the users of Reagan, Dulles, or the Toll Road to subsidize the costs of a variety of other facilities

and activities they are not using—cannot flow from the Compact Clause, which is MWAA's only claimed source of power to exercise that authority.

111.   Accordingly, Congress could not and cannot validly delegate to MWAA the federal powers MWAA has purported to exercise in its management of the Aviation and Dulles Corridor Enterprises.

112.   Similarly, the Secretary did not have the constitutional authority to transfer federal property, specifically the premises of Reagan and Dulles as defined in 49 U.S.C. § 49103, to an entity like MWAA, and subject users of Reagan, Dulles, and the Toll Road to the federal powers MWAA claims to exercise.

113.   MWAA's exercise of federal power to compel persons using Reagan, Dulles, or the Toll Road to subsidize at MWAA's discretion public facilities not being used by those persons or activities in which those persons are not participating is therefore without legal authority and should be set aside; restitution should be made for those subsidies; and the Secretary should retake possession of the premises leased to MWAA under the Airports Lease.

### Count Three:  Separation of Powers Generally
#### (Against All Defendants)
#### Congress unconstitutionally delegated federal power to an entity that is "independent" of any branch of the Government.

114.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

115.   Even if MWAA were a proper Compact Clause entity, Congress has made an unprecedented and unconstitutional delegation to MWAA of significant federal authority.  Specifically, the statute creating MWAA purports to make it not

only "independent of Virginia and its local governments" as well as "the District of Columbia," but also "independent of … the United States Government." 49 U.S.C. § 49106(a)(2).   This is an improper attempt to insulate MWAA from accountability to the President, other federal officers, or even Congress itself.   Whether or not MWAA is a federal entity, MWAA's purported exercise of federal power and authority is therefore unconstitutional for that reason alone.   *See Free Enterprise Fund v. Public Accounting Oversight Bd.,* 561 U.S. 477 (2010).

116.   The same is true if MWAA is deemed a non-governmental entity. While Congress and other federal actors can delegate "ministerial" or "advisory" tasks to private entities, they cannot delegate federal power and authority to private bodies.   *See Pittston Co. v. United States*, 368 F.3d 385, 394, 398 (4th Cir. 2004) (quoting and citing *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940)); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

117.   Because the federal power and authority delegated to MWAA are improper under these principles, MWAA's authority to manage the Aviation and Dulles Corridor Enterprises—including its purported authority to force the users of Reagan, Dulles, or the Toll Road to subsidize the costs of a variety of other facilities and activities they are not using—is invalid.   Accordingly, Congress could not and cannot validly delegate to MWAA the federal powers MWAA has purported to exercise in its management of the Aviation and Dulles Corridor Enterprises.

118.   Similarly, the Secretary did not have the constitutional authority to transfer federal property, specifically the premises of Reagan and Dulles as defined

in 49 U.S.C. § 49103, to an entity like MWAA, and subject users of Reagan, Dulles, and the Toll Road to the federal powers MWAA claims to exercise.

119.    MWAA's purported exercise of federal power to compel persons using Reagan, Dulles, or the Toll Road to subsidize at MWAA's discretion public facilities not being used by those persons or activities in which those persons are not participating is therefore without legal authority and should be set aside, restitution should be made for those subsidies, and the Secretary should retake possession of the premises leased to MWAA under the Airports Lease.

### Count Four: Separation of Powers / Article II
**(Against All Defendants)**
**MWAA exercises federal executive power in violation of Article II.**

120.    Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

121.    Article II of the United States Constitution "vests '[t]he Executive power … in a President of the United States of America, who must 'take Care that the Laws be faithfully executed.'" *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483 (2010) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). Article II also gives the President power to "nominate, and by and with the Advice and Consent of the Senate … [to] appoint" all "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. Congress, however, "may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

122.   Whether "inferior" or "principal," "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore be appointed in the manner prescribed by [Article II] § 2, cl. 2[.]" *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

123.   Such an officer must also be effectively removable by the President. *See Free Enterprise Fund,* 561 U.S. at 493-98.

124.   MWAA's organization violates these bedrock principles.  For one thing, federal law requires that MWAA be governed by a 17-member Board of Directors. 49 U.S.C. § 49106(c).  However, only three of those Board members are appointed by the President with the advice and consent of the Senate.  *Id.* § 49106(c)(1)(D).  The President can remove his appointees only for cause.  *Id.* § 49106(c)(6)(C).  The remaining 14 members are appointed by the governors of Maryland and Virginia and by the mayor of the District, and can be removed only by them.  *Id.* § 49106(c)(1)(A)-(C).  Those 14 members—a substantial majority of the Board—thus cannot be removed by the President at all.

125.   The MWAA Board of Directors nevertheless exercises "executive authority" within the meaning of Article II of the Constitution.

126.   Thus, regardless of whether MWAA is a valid interstate compact entity, MWAA's structure violates the Take Care and Appointments Clauses of Article II.  For example, because the President of the United States controls only three of the 17 members of the MWAA Board of Directors, and cannot remove any of

the remaining 14 members, by definition the President cannot "take Care" that MWAA is "faithfully execut[ing]" the laws of the United States.

127.  Furthermore, regardless of whether MWAA's Board members constitute "principal" or "inferior" Officers of the United States, their manner of appointment violates the Appointments Clause.

128.  To the extent MWAA's Board members constitute "principal Officers" under Article II, MWAA violates Article II because 14 of the 17 members are not appointed by the President of the United States, and cannot be removed by him.

129.  To the extent MWAA's Board members constitute "inferior Officers" under Article II, MWAA violates Article II because Congress has vested the appointment of 14 of 17 members in neither the President, the courts of law, or the head of a Department.

130.  Because of these constitutional violations, the Secretary did not have the constitutional authority to transfer federal property, specifically the premises of Reagan and Dulles as defined in 49 U.S.C. § 49103, to MWAA so as to subject users of Reagan, Dulles, and the Toll Road to federal executive power that MWAA cannot constitutionally exercise.

131.  For similar reasons, regardless whether MWAA is a valid Compact Clause entity, MWAA's exercise of federal executive power to compel persons using Reagan, Dulles, or the Toll Road to subsidize at MWAA's discretion public facilities not being used by those persons or activities in which those persons are not participating is therefore without legal authority and should be set aside,

restitution should be made for those subsidies, and the Secretary should retake possession of the premises leased to MWAA under the Airports Lease.

**Count Five: Separation of Powers / Article I**
**(Against All Defendants)**
**MWAA exercises federal legislative power in violation of Article I.**

132.    Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

133.    MWAA and the activities at issue here depart from separation-of-powers principles flowing from or embodied in Article I of the Constitution, in several distinct but overlapping respects.

**a.  No intelligible principle based on "airport purposes."**

134.    First, Congress has provided no intelligible principle to govern MWAA's exercise of federal authority.

135.    Congress may delegate decisionmaking authority to a federal agency, but only if Congress "'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (internal quotation marks omitted).

136.    The Transfer Act violates the non-delegation doctrine by effectively delegating legislative authority to MWAA, that is, it purports to delegate such authority without laying down by statute an intelligible principle to which MWAA must conform.

137.    The only constraint on MWAA is that the federal property leased to it must be used for "airport purposes."  However, "airport purposes" cannot and does

not operate as any kind of "intelligible principle" to which MWAA must conform in exercising its delegated powers, as evidenced by the fact that MWAA's assumption of Virginia's Toll Road – a highway which by law cannot serve any airport – has been deemed to be an "airport purpose."

### b.   No intelligible principle based on other sections of the Transfer Act.

138.   Other provisions of the Transfer Act do not provide an intelligible principle that cabins the powers delegated to MWAA.   For example, 49 U.S.C. § 47107(a)(13)(A) provides that "the airport owner or operator will maintain a schedule of charges for the use of facilities and services *at the airport* … that will make the airport as self-sustaining as possible under the circumstances existing *at the airport*."  (Emphases added.)  But the Toll Road is not a facility or service at the airport.  So this provision is either irrelevant to the Toll Road or in fact bars MWAA from exacting subsidies from Toll Road users to pay for other facilities that they are not using and that are not at the airport, such as the Metrorail Project.

139.   As another example, 49 U.S.C. § 49104(a)(3) provides that "all revenues generated by the Metropolitan Washington Airports shall be expended for the capital and operating costs of the Metropolitan Washington Airports."   But while the Toll Road is located in the right-of-way for the Dulles Corridor, and so technically is a part of the "Airports," the Toll Road is a Virginia facility resting on an easement owned by Virginia.  The Transfer Act did not convey control of the Toll Road to MWAA.   Only MWAA's unilateral negotiation of an agreement with Virginia years later resulted in a Permit from Virginia that gave MWAA control of

the Toll Road.  Thus MWAA used its delegated power to reach out to dramatically expand the scope of that delegation to include two major facilities not within the scheme established by the Transfer Act.  So this provision also cannot be a limiting intelligible principle on MWAA's delegated power.

140.   Furthermore, amendments to the Transfer Act in 2012 make the situation worse, amending the Act's definition of "airport purposes," which purportedly limits the scope of MWAA's powers, to allow MWAA to engage in any "business or activity *not inconsistent with* the needs of aviation." 49 U.S.C. § 49104(a)(2)(B)(iv) (emphasis added).

141.   This authorization is so pliant that there are very few activities and functions that MWAA would be prohibited from undertaking.   There is no "intelligible principle" at work when an entity to which governmental power has been delegated, like MWAA, can expand its mission, functions and activities, that is, the reach of its delegated powers, as it chooses.  Thus, the 2012 amendments again illustrate that Congress's attempt to broadly delegate authority to MWAA lacks the "intelligible principle" necessary to avoid a violation of Article I.

### c.  Broad federal legislative powers (other than the taxing power).

142.   Besides failing to provide the requisite "intelligible principle" for the exercise of federal authority, Congress's delegation of that authority and MWAA's exercise of that power independently violate the Constitution for another reason. *See Whitman, supra,* 531 U.S. at 487 (Thomas, J., concurring) (statute can violate Article I limitation whether or not it provides "intelligible principle").  Congress has independently violated Article I by purporting to delegate to MWAA a host of broad

legislative powers—in addition to Congress's exclusive taxing power, discussed below in the next subsection.

143.   As the Justice Department has conceded, MWAA was created "by federal command," and its "powers and authority … were, and still are, dictated by Congress."  Brief for the Intervenor United States, *Hechinger v. MWAA,* 36 F.3d 97 (D.C. Cir. 1994) (No. 94-7036), 1994 WL 16776877, at *11.

144.   The Constitution, however, prohibits Congress from delegating its legislative authority to anyone. *See, e.g., Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (explaining that the "text [of Article I § 1] permits no delegation of [legislative] powers").  The Constitution also prohibits Congress from delegating federal power or authority to a private entity. *See, e.g., Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).  The same principle prohibits Congress from delegating federal power or authority to another public entity, particularly an entity that is entirely "independent of … the United States Government." 49 U.S.C. § 49106(a)(2).

145.   Instead, Article I, § 1 of the Constitution vests "[a]ll legislative Powers herein granted … in a Congress of the United States."  Among the powers included within Congress's legislative power are the powers to "provide for the common defense and general welfare of the United States," (the spending power), and to "lay and collect" not only "taxes" (the taxing power), but also "duties, imposts and excises."  U.S. Const. art. I, § 8, cl. 1.  We will refer to the authority to "lay and collect … duties, imposts and excises" other than taxes as the "revenue-generating power."

146.    The exercise of the legislative power to spend for the general welfare requires an exercise of judgment as to what measures will advance general public purposes.   It includes the drawing of lines "between one welfare and another, between particular and general."   *Helvering v. Davis,* 301 U.S. 619, 640-41 (1937). The exercise of this judgment may involve the imposition of reasonable conditions on the use of public funds or public facilities.   *See Ivanhoe Irr. Dist. v. McCracken,* 357 U.S. 275, 295 (1958); *S. Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

147.    Moreover, the exercise of the revenue-generating power—i.e., the legislative power to exact money (other than taxes)—includes both selecting the subjects of the exaction, and also setting the level of the exaction.   *See, e.g., Sonzinsky v. United States*, 300 U.S. 506, 512 (1937).

148.    All exercises of the legislative power delegated by the Constitution are subject to the constitutional requirement that legislation be passed by both houses of Congress and presented to the President.   *See* U.S. Const. art. I, § 7, cl. 2 (providing that "[e]very Bill which shall have passed the House of Representatives and the Senate shall, before it becomes a law, be presented to the President of the United States"); *see also, e.g., INS v. Chadha*, 462 U.S. 919, 946 (1983) (observing that these bicameralism and presentment requirements of Article I "are integral parts of the constitutional design for the separation of powers").

149.    The geographic area in which MWAA exercises this legislative power covers an area far larger than the airports proper, stretching 24 miles along the Dulles Corridor.   *See* 49 U.S.C. § 49103(4); *see also* 65 Fed. Reg. 39,466, 39,467

(June 26, 2000). Within that expansive grant, MWAA has the prerogative to do anything with its real property to advance the elastic notion of "airport purposes." 49 U.S.C. § 49104(a)(2)(B). Indeed, the text of the statute now purports to include within "airport purposes," not just "aviation business or activities," *id.* § 49104(a)(2)(A)(i), and activities necessary to support "air commerce," *id.* § 49104(a)(2)(A)(ii), but *any* "business or activity" that MWAA and the Secretary of Transportation agree are "*not inconsistent* with the needs of aviation." *Id.* § 49104(a)(2)(A)(iv) (emphasis added). As previously noted, the latter provision is invalid as a violation of the non-delegation doctrine because it deprives MWAA of any "intelligible principle" to guide its actions. But it also highlights the unconstitutional breadth of the spending and revenue-generating power Congress has granted.

150. In aid of MWAA's mission, Congress has also given MWAA a variety of other broad powers. For instance,

      a. MWAA can "acquire, maintain, improve, operate, protect, and promote" the airports as it sees fit, 49 U.S.C. § 49106(b)(A);

      b. MWAA can "acquire real or personal property" *id.* § 49106(b)(C);

      c. MWAA can "issue bonds from time to time in its discretion," *id.* § 49106(b)(B), to finance its spending on acquisitions, improvements and operations; and

d. MWAA can "levy fees or other charges" to generate the revenue it needs to support its spending and the bonds financing that spending. *Id.* § 49106(b)(E).

151. MWAA's unconstrained power to choose what facilities it will build, and how it will generate the revenue to pay for them—MWAA's legislative prerogative—is nowhere better on display than in its control of the Metrorail Project construction. According to WMATA, that project is the "largest and one of the most complex transportation projects in the United States." As described above, MWAA has chosen to rely on money exacted from Toll Road drivers to pay for the largest portion of the multi-billion-dollar cost of the Metrorail Project. Thus, at the prerogative of MWAA, huge sums are being exacted from citizens using one facility (and mode of transportation) to pay for a different facility (and different mode of transportation) that they are not using, and may never use.

152. Similarly illustrating the extent of MWAA's prerogative was its initial decision in April 2011 to build an underground station for the Metrorail Project's Silver Line at the Dulles terminal. MWAA made this choice even though an underground station would cost $330 million more than an above-ground station and significantly delay the expected opening day for the Metrorail Project. Only after an extended uproar from local and state leaders did MWAA back down nearly a year later and opt for the above-ground facility.

153. MWAA's claimed authority to spend on anything that it deems might "improve" or "promote" or "protect" Reagan and the Dulles Corridor, and on any

"business or activity not inconsistent with the needs of aviation" (and also approved by the Secretary of Transportation) constitutes an exercise of the spending power under Article I, section 8 of the Constitution and/or other legislative powers reserved to Congress under Article I.

154.   The exercise of MWAA's authority over the Aviation and Dulles Corridor Enterprises to exact money from users of Reagan, Dulles, and the Toll Road at levels needed to finance MWAA's spending on its chosen projects constitutes an exercise of the revenue-generating power under Article I, section 8 of the Constitution and/or other legislative powers reserved to Congress under Article I.

155.   The independent exercise by MWAA of these federal legislative powers has never been subject to the bicameralism and presentment requirements of Article I of the Constitution.  No law respecting the exaction of money from users of Reagan, Dulles, and the Toll Road to subsidize other public facilities they are not using has ever passed both houses of Congress or been presented to the President. Similarly, no law respecting the levels of those exactions from Toll Road motorists to fund the Metrorail Project or other activities has ever passed both houses of Congress or been presented to the President.

156.   Consequently, regardless whether MWAA is a valid interstate compact entity, and regardless whether the Transfer Act provides an "intelligible principle" to guide MWAA's exercise of authority, MWAA's purported exercise of the federal

spending and revenue-generating powers violates the bicameralism and presentment requirements of Article I of the Constitution.

### d.  Federal taxing power.

157.   Besides failing to provide the requisite "intelligible principle" for the exercise of federal authority, and besides delegating other broad legislative power to MWAA, Congress' delegations to MWA violates the separation of powers principles embodied in Article I for another reason—Congress has unconstitutionally delegated a portion of its taxing power to MWAA.

158.   The exercise of MWAA's authority over the Aviation and Dulles Corridor Enterprises to exact money from users of Reagan, Dulles, and the Toll Road at levels needed to finance MWAA's spending on its chosen projects constitutes an exercise of the power of taxation under Article I, section 8 of the Constitution.

159.   However, the independent exercise by MWAA of this fundamental federal legislative power has never been subject to the bicameralism and presentment requirements of Article I of the Constitution.  Specifically, no law respecting the exaction of money from users of Reagan, Dulles, and the Toll Road to subsidize other public facilities they are not using has ever passed both houses of Congress or been presented to the President.

### e.  Remedies.

160.   Because of these constitutional violations, or any combination of them, the Secretary did not have the constitutional authority to transfer federal property,

specifically the premises of Reagan and Dulles as defined in 49 U.S.C. § 49103, to MWAA so as to subject users of Reagan, Dulles, and the Toll Road to federal legislative power that MWAA cannot constitutionally exercise.

161.   For similar reasons, regardless whether MWAA is a valid Compact Clause entity, MWAA's exercise of federal legislative power to compel persons using Reagan, Dulles, or the Toll Road to subsidize at MWAA's discretion public facilities not being used by those persons or activities in which those persons are not participating is therefore without legal authority and should be set aside, restitution should be made for those subsidies, and the Secretary should retake possession of the premises leased to MWAA under the Airports Lease.

### Count Six: Due Process Clause / Fifth Amendment
**(Against All Defendants)**
**MWAA exacts subsidies from users of Reagan, Dulles, and the Toll Road in violation of due process.**

162.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

163.   The Fifth Amendment to the United States Constitution provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

164.   The Due Process Clause prohibits the federal government from exacting or retaining money from persons in contravention of the Constitution, a statute, or a regulation.

165.   MWAA has been authorized by federal law to "levy fees or other charges," 49 U.S.C. § 49106(b)(1)(E), but this authority does not extend so far as to

empower MWAA to exact and retain money from users of Reagan, Dulles, and the Toll Road to subsidize other public facilities they are not using.

166. Accordingly, MWAA's illegal exaction and retention of fees from users of Reagan, Dulles, and the Toll Road to subsidize other public facilities they are not using violates the Due Process Clause.

167. Moreover, by issuing a "certificate" pursuant to the Airports Lease purporting to approve MWAA's exercise of governmental power to make these exactions and retain this money, the Secretary aided and abetted MWAA's illegal exactions. The Secretary is jointly and severally liable for MWAA's illegal exactions.

168. Accordingly, regardless whether MWAA is a valid Compact Clause entity, MWAA's illegal exactions compelling persons using Reagan, Dulles, or the Toll Road to subsidize public facilities not being used by those persons or activities in which those persons are not participating are therefore without legal authority and should be set aside, restitution should be made for those subsidies, and the Secretary should retake possession of the premises leased to MWAA under the Airports Lease.

**Count Seven: Violation of MWAA's Governing Legislation**
**(Against MWAA)**
**MWAA's actions exceed its statutory authority.**

169. Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

170.   The Transfer Act authorizes MWAA to "operate, maintain, protect, promote, and develop the Metropolitan Washington Airports as a unit and as primary airports serving the Metropolitan Washington area." 49 U.S.C. § 49104(a)(1).   Furthermore, MWAA is authorized to use the leased property interests "only for airport purposes." *Id.* § 49104(a)(2)(A)(iv), (B).

171.   Under the Transfer Act, "airport purposes" means "aviation business or activities" or "activities necessary or appropriate to serve passengers or cargo in air commerce."   *Id.* § 49104(a)(2)(A).

172.   Assuming these provisions of the Transfer Act are constitutional, MWAA's operation of the Aviation and Dulles Corridor Enterprises and its use of revenue exacted from users of Reagan, Dulles, and the Toll Road to subsidize other facilities and activities, as described above, do not constitute an "airport purpose" within the proper meaning of the Transfer Act, and those actions are therefore in violation of the Transfer Act.   Specifically, that activity is not an "aviation business or activity," because it is unrelated to aviation, and it does not directly serve such a business or activity.   Nor does the operation of the airports or the Toll Road—built, after all, to serve traffic *not* going to the airport—and MWAA's use of toll revenue to fund construction of the Metrorail Project—designed to serve a community of riders far broader than passengers just going to the airport—an "activit[y] necessary or appropriate to serve passengers or cargo in air commerce."   Nor does it directly serve these objectives.

173.    MWAA's practice of imposing excessive charges for some of its services in order to subsidize such things as the Silver Line, Metro cars and maintenance, and Virginia Route 606 also violates other statutes governing MWAA's operations. For example, 49 U.S.C. § 49104(a)(3), requires that MWAA use "all revenues" solely for the "capital and operating costs" of the airports.   MWAA, however, is violating this provision by using a portion of the "revenues" it collects, not for the "capital and operating costs" of airport facilities, but for other projects.

174.    Another provision, 49 U.S.C. § 47107(a)(13)(A), imposes on MWAA an obligation to set "charges for the use of facilities ... that will make the airport as self-sustaining as possible...."   The obvious way to do that, if there are excess revenues, is to put those revenues in a trust fund or analogous account so they can be used to meet future expenses of airport facilities.   But MWAA, by using excess revenues from Toll Road tolls and airport fees to fund the Metrorail Project and other projects, is obviously not "making the airports as self-sustaining as possible."   It could be making the airports more "self-sustaining" by putting those excess funds away for future airport-related needs.

175.    Consequently, the Secretary should be ordered to direct that MWAA (a) withdraw from its agreements with VDOT to assume control of and operate the Toll Road and to construct the Metrorail Project, and (b) cease levying charges and fees on users of Reagan, Dulles, and the Toll Road to subsidize the Metrorail Project and other facilities and activities that are unrelated to genuine "airport purposes."

176.   In addition, for this reason too, MWAA's prior and ongoing attempt to compel persons using Reagan, Dulles, or the Toll Road to subsidize public facilities and services not being used by those persons or activities in which those persons are not participating are therefore without legal authority and should be set aside, restitution should be made for those subsidies, and the Secretary should retake possession of the premises leased to MWAA under the Airports Lease.

### Count Eight: Violation of the Airports Lease
### (Against MWAA)
### MWAA's actions violate the terms of the Airports Lease.

177.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

178.   The Transfer Act requires the terms of the Airports Lease to include the terms of the Transfer Act. 49 U.S.C. § 49104(a).   The Airports Lease thus incorporates the requirements of the Transfer Act that MWAA use leased property "only for airport purposes." *Id.* § 49104(a)(2)(A), (B).

179.   MWAA, however, is violating this requirement by spending money exacted from users of Reagan, Dulles, and the Toll Road to subsidize the improvements to State Route 606, the expansion and construction of maintenance yards for rail cars not used on the Silver Line, the procurement of rail cars for WMATA that will not be used on the Silver Line, a real estate management and marketing program, and the construction of the Silver Line.   These expenditures have no relation to legitimate "airport purposes," as discussed above.

180.   These expenditures, and the exactions made to fund them, violate the Airports Lease, because those expenditures have not been made and are not being made for valid "airport purposes" under the Transfer Act.

181.   The Transfer Act expressly empowers the courts of the United States "to compel [MWAA] and its officers and employee to comply with the terms of the lease." *Id.* § 49104(c).

182.   Therefore, this Court should order MWAA to comply with the terms of its lease by ceasing to exact money from users of Reagan, Dulles, and the Toll Road to subsidize public facilities not being used by those persons or activities in which those persons are not participating.   Accordingly, MWAA's actions compelling persons using Reagan, Dulles, or the Toll Road to subsidize public facilities not being used by those persons or activities in which those persons are not participating are therefore without legal authority and should be set aside, restitution should be made for those subsidies, and the Secretary should retake possession of the premises leased to MWAA under the Airports Lease.

**Count Nine: Administrative Procedure Act—MWAA**
**(Against MWAA)**
**MWAA's actions constitute unlawful agency action.**

183.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

184.   MWAA is a public body authorized by Congress to exercise federal regulatory power. To that extent, MWAA's actions are reviewable under the standards of the Administrative Procedure Act.

185.   Under the Administrative Procedure Act, a court may set aside final agency action that is unlawful.  *See generally* 5 U.S.C. § 706(2)(A)-F) (setting forth grounds for finding agency action unlawful); *id.* § 704 (allowing judicial review of final agency action).

186.   MWAA is authorized by federal law to "operate, maintain, protect, promote, and develop the Metropolitan Washington Airports as a unit and as primary airports serving the Metropolitan Washington area." 49 U.S.C. § 49104(a)(1).

187.   Furthermore, MWAA is authorized to use the leased property interests "only for airport purposes." *Id.* § 49104(a)(2)(A)(iv), (B).

188.   By exacting money from persons using Reagan, Dulles, or the Toll Road to subsidize public facilities not being used by those persons or activities in which those persons are not participating, MWAA undertook final agency action within the meaning of the Administrative Procedures Act.

189.   MWAA has also undertaken final agency actions with respect to the provision of maintenance and repair services for rail cars that are not used on the Dulles Metrorail Project, the purchase of rail cars that will not be used on the Dulles Metrorail Project, the establishment of a real estate management and marketing program, and the funding of improvements to State Route 606 in Loudoun County, all of which MWAA subsidizes with money exacted from users of Reagan, Dulles and the Toll Road.

190.    MWAA's levying charges and fees on users of Reagan, Dulles and the Toll Road to subsidize public facilities not being used by those persons or activities in which those persons are not participating violated the Administrative Procedure Act because those final agency actions were: (a) arbitrary, capricious, and an abuse of discretion; (b) contrary to the constitutional rights of users of Reagan, Dulles and the Toll Road; (c) as described above, in excess of the powers that may be constitutionally delegated to and exercised by MWAA; (d) in excess of statutory and/or constitutional authority or limitations, and (e) undertaken without observance of procedure required by law.

191.    Accordingly, MWAA's exaction of money from persons using Reagan, Dulles, or the Toll Road to subsidize public facilities not being used by those persons or activities in which those persons are not participating is therefore unlawful, should be set aside, and restitution be made for those subsidies.

**Count Ten: Administrative Procedure Act—The Secretary**
**(Against the Secretary and DOT)**
**The Secretary's actions constitute unlawful agency action.**

192.    Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

193.    Under the Transfer Act, the real property subject to the Airports Lease may be used "only for airport purposes." 49 U.S.C. § 49104(a)(2)(B).

194.    If the Secretary determines that any of the leased property is used for other than airport purposes, the Secretary is required to "direct that [MWAA] take appropriate measures to have that part of the property be used for airport

purposes," and "retake possession of the property" if MWAA fails to have that part of the property be used for airport purposes within a reasonable period of time determined by the Secretary. *Id.* § 49104(a)(2)(C).

195. In October 2008, the Secretary of Transportation certified that MWAA's operation of the Toll Road and its use of toll revenue to fund construction of the Metrorail Project were valid "airport purposes" within the meaning of the MWAA lease.

196. This action by the Secretary constituted final agency action within the meaning of the Administrative Procedure Act.

197. The Secretary's approval of MWAA's operation of the Toll Road and its use of toll revenue to fund construction of the Metrorail Project violated the Administrative Procedure Act because that final agency action: (a) was arbitrary, capricious, and an abuse of discretion; (b) was contrary to the constitutional rights of users of Reagan, Dulles and the Toll Road; (c) as described above, unlawfully purported to approve activities which are in excess of the powers that may be constitutionally delegated to and exercised by MWAA;; (d) as described above, in excess of statutory and/or constitutional authority or limitations,; and (e) was undertaken without observance of procedure required by law.

198. Therefore, (a) the Secretary's action should be held unlawful and set aside; (b) the Secretary should be ordered to (i) direct MWAA to cease all exactions compelling persons using Reagan, Dulles, or the Toll Road to subsidize public facilities not being used by those persons or activities in which those persons are not

participating, (ii) retake possession of the premises leased to MWAA, and (iii) not impose such exactions himself; and (c) make restitution for those subsidies.

**Count Eleven: 42 U.S.C. § 1983**
**(Against MWAA)**
**MWAA's actions in violation of federal law deprive plaintiffs of their federal rights under color of state law.**

199.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

200.   42 U.S.C. § 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

201.   MWAA purports to exercise authority pursuant to an interstate compact approved by Congress.

202.   The actions of a putative interstate compact entity—despite the fact that the compact is approved by Congress and its terms thereby become federal law— nonetheless constitute actions taken "under color of state law" for purposes of section 1983. *See Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 399-400 (1979) (holding that actions by compact entity formed by California and Nevada were "under color of state law" for purposes of section 1983).

203.   Indeed, MWAA itself has claimed in the Supreme Court that it is "empowered by and function[s] pursuant to state law."   Brief for the Petitioners, 1991 WL 11007778, *19, *CAAN* (filed March 1, 1991).

204.   If that is correct, MWAA exercises authority "under color of state law" for purposes of section 1983.

205.   For the reasons set forth above, MWAA's exactions of money from persons using Reagan, Dulles, or the Toll Road to subsidize public facilities not being used by those persons or activities in which those persons are not participating deprive the Plaintiffs and the Class members of their rights, privileges, and immunities secured by the Constitution and laws.

206.   MWAA's exactions of money compelling persons using Reagan, Dulles, or the Toll Road to subsidize at MWAA's discretion public facilities not being used by those persons or activities in which those persons are not participating is therefore unlawful and should be set aside, MWAA should make restitution for those subsidies, and MWAA should be enjoined to return possession of the premises leased to MWAA under the Airports Lease to the Secretary.

## **PRAYER FOR RELIEF**

Therefore, Plaintiffs, individually and on behalf of the Class Members, demand judgment against Defendants awarding the following relief:

A.   an order certifying an appropriate Class and/or Subclasses, designating Plaintiffs as Class Representatives, and designating their counsel of record as Class Counsel;

B.     an order declaring MWAA unconstitutional because it is not a valid interstate compact entity;

C.     an order declaring the consent of the United States to the purported compact between MWAA and Virginia to be invalid and void;

D.     an order declaring that federal authority has been unconstitutionally delegated to MWAA under the Compact Clause;

E.     an order declaring that Congress has unconstitutionally delegated federal power to MWAA while at the same time making MWAA "independent" of the federal government;

F.     an order declaring that MWAA's exercise of federal legislative powers is unconstitutional for failing to comply with the bicameralism and presentment requirements of Article I of the Constitution;

G.     an order declaring that legislative power has been unconstitutionally delegated to MWAA because that delegation is unconstrained by any intelligible principle, and that all actions taken by MWAA pursuant to those delegations are void *ab initio*;

H.     an order declaring that MWAA's exercise of federal executive power violates the Take Care and Appointments Clauses of Article II of the Constitution;

I.     an order declaring that because MWAA is unconstitutional, MWAA had no authority to exact and retain money from Plaintiffs and the Class Members and that MWAA's illegal exaction and that retention of money from Plaintiffs and the Class Members violates the Due Process Clause;

J.     an order declaring that because MWAA is unconstitutional, MWAA had no authority to exact and retain money from Plaintiffs and the Class Members and MWAA's exaction and retention of money from Plaintiffs and the Class Members is unlawful under the Administrative Procedure Act and void *ab initio*;

K.     an order declaring that the Secretary's certification of the Metrorail Project as a valid "airport purpose" under the Airports Act and MWAA lease is unlawful under the Administrative Procedure Act;

L.     an order declaring that MWAA and the Secretary are jointly and severally liable for the illegal exaction and retention of money from Plaintiffs and the Class members;

M.     alternatively, an order declaring that because MWAA is unconstitutional, MWAA's exaction and retention of money from Plaintiffs and the Class Members deprived the plaintiffs, under color of state law, of their rights, privileges, and immunities under the Constitution and laws of the United States and was void *ab initio*;

N.     an order enjoining the Secretary to retake possession of the premises leased to MWAA under the Airports Lease;

O.     an order enjoining the Secretary from continuing to exact funds from Plaintiffs and the Class Members to subsidize public facilities not being used by them or activities in which they are not participating;

P.      an order enjoining MWAA from continuing to exact funds from Plaintiffs and the Class Members to subsidize public facilities not being used by them or activities in which they are not participating;

Q.      a declaration that MWAA and the Secretary are financially responsible for notifying all Class members that they have been the subject of illegal exactions;

R.      an order requiring MWAA and the Secretary to make restitution of the amount of money unlawfully exacted from Plaintiffs and Class members;

S.      an award of attorneys' fees and costs, as allowed by law;

T.      an award of pre-judgment and post-judgment interest, as provided by law; and

U.      such other relief as may be appropriate under the circumstances.

<u>**DEMAND FOR JURY TRIAL**</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, individually and on behalf of the Class, demand a trial by jury of any and all issues in this action so triable by right.

Respectfully submitted,

| /s/ Robert J. Cynkar | /s/ S. Kyle Duncan |
|---|---|

ROBERT J. CYNKAR (Va. Bar No. 23349)
rcynkar@mck-lawyers.com
PATRICK M. MCSWEENEY (Va. Bar No. 5669)
patrick@mck-lawyers.com
CHRISTOPHER I. KACHOUROFF (Va. Bar No. 44216)
MCSWEENEY, CYNKAR & KACHOUROFF. PLLC
13649 Office Place, Suite 101
Woodbridge, VA 22192
(703) 621-3300

S. KYLE DUNCAN (admitted *pro hac vice*)
KDuncan@Schaerr-Duncan.com
GENE C. SCHAERR (*pro hac vice* pending)
GSchaerr@Schaerr-Duncan.com
SCHAERR | DUNCAN LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 714-9492

*Counsel for Plaintiffs*