IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

PHIL KERPEN, Individually and    )
on behalf of All Others          )
Similarly Situated, et al.,      )
                                 )
     Plaintiffs,                 )
                                 )
        v.                       )    1:16cv1307 (JCC/TCB)
                                 )
METROPOLITAN WASHINGTON          )
AIRPORTS AUTHORITY, et al.,      )
                                 )
     Defendants.                 )
                                 )

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on the Motions for
Partial Summary Judgment [Dkt. 46] and for Leave to File
Supplemental Authority [Dkt. 127] filed by Plaintiffs Phil
Kerpen, Cathy Ruse, Austin Ruse, Charlotte Sellier, Joel
Sellier, and Michael Gingras.  Also before the Court are the
Motions to Dismiss filed by Defendants Metropolitan Washington
Airport Authority (WMAA) [Dkts. 90, 91], the District of
Columbia [Dkt. 94], Secretary of Transportation Anthony Foxx,
and the U.S. Department Of Transportation [Dkts. 85, 86].
Although not a party, the Commonwealth of Virginia has filed a
Brief Amicus Curiae in Support of Dismissal [Dkt. 83-1].

Plaintiffs – individuals who "ha[ve] used, and continue[ ] to use" the facilities at Ronald Reagan Washington National Airport and Washington Dulles International Airport, and who pay tolls on the Dulles toll road, Am. Compl. [Dkt. 37] ¶¶ 17-22 – filed this putative class action on July 5, 2016. The putative class includes "all persons or entities in the United States who used the facilities located on or within the premises" at National and Dulles "leased to MWAA . . . and from whom MWAA has exacted a fee, charge, toll or other similar payment from November 2008 to present." *Id.* ¶ 78.

Plaintiffs challenge MWAA's authority on a variety of constitutional and statutory grounds.  Broadly speaking, Plaintiffs contend that (1) MWAA results from an unlawful interstate compact between Virginia and the District of Columbia (Counts I - II); (2) the federal government has improperly delegated federal power to MWAA (Counts III – V); (3) the tolls charged by MWAA are illegal exactions (Count VI); (4) MWAA has contravened the lease, and the related federal law, under which it maintains properties owned by the federal government (Counts VII – VIII); (5) MWAA and the federal government have both violated the Administrative Procedures Act (APA) (Counts IX – X); and (6) MWAA has violated 42 U.S.C. § 1983 (Count XI).  For the following reasons, the Court will grant Defendants' Motions to Dismiss for Failure to State a Claim, deny Plaintiffs'

2

Motions for Partial Summary Judgment and for Leave to File
Supplemental Authority, and dismiss Plaintiffs' Complaint with
prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I. Background

Facts drawn from the allegations of and exhibits to
Plaintiffs' Amended Complaint [Dkt. 38] are taken as true for
purposes of Defendants' Motions, insofar as those Motions are
brought pursuant to Federal Rule of Civil Procedure 12(b)(6).
*See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637
F.3d 435, 440 (4th Cir. 2011).  In addition to Plaintiffs'
Amended Complaint, the Court considers matters of public record
subject to judicial notice, *see Philips v. Pitt Cty. Mem'l
Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009), and cited by
Defendants without objection by Plaintiffs.

### A.  MWAA's Origins

Ronald Reagan Washington National Airport and
Washington Dulles International Airport are two of three major
airports serving the Washington, D.C., metropolitan area.  Am.
Compl. [Dkt. 37] ¶ 26.  Both are located in Virginia, *id.*, and
are "the only two major commercial airports owned by the Federal
Government."  *Metro. Washington Airports Auth. v. Citizens for
Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 256 (1991)
(*CAAN*).

Originally, both National and Dulles were managed by the Federal Aviation Administration (FAA). Am. Compl. [Dkt. 37] ¶ 26. Eventually, however, "the Secretary of Transportation concluded that necessary capital improvements could not be financed for either National or Dulles unless control of the airports was transferred to a regional authority with power to raise money by selling tax-exempt bonds." *CAAN*, 501 U.S. at 257. In 1984, a commission made up primarily of local, state, and federal representatives from Virginia, Maryland, and the District of Columbia – deemed "the parties principally interested in the operation" of the airports – was tasked with "developing a proposal for transferring" the airports "from federal ownership to a state, local or interstate public entity." 131 Cong. Rec. S9608, S9609 (Apr. 26, 1986).[1] The commission ultimately determined that "Washington National and Washington Dulles International Airports should be transferred

---

[1]     The commission included Linwood Holton, Jr., former Governor of Virginia; Franklin E. White, representing Governor of Virginia Charles S. Robb; John W. Warner, U.S. Senator from Virginia; Frank Wolf, U.S. House Representative from Virginia; Martha V. Pennino of the Fairfax County, Virginia Board of Supervisors; Pauline A. Schneider, representing District of Columbia Mayor Marion Barry, Jr., Betty Ann Kane of the District of Columbia Council; Harry R. Hughes, Governor of Maryland; Paul S. Sarbanes, U.S. Senator from Maryland; Steny H. Hoyer, U.S. House Representative from Maryland; and Scott Fosler, Councilman from Montgomery County, Maryland. *See* 131 Cong. Rec. S9609. The commission also included three representatives from airport-related industries and William J. Ronan, previous chairman and board member of the Port Authority of New York and New Jersey.

by . . . Congress to a single, independent public authority to be created jointly by the Commonwealth of Virginia and the District of Columbia[.]"  131 Cong. Rec. S9608.

In accordance with this plan, Virginia and the District of Columbia enacted reciprocal legislation creating MWAA in 1985.  *See* D.C. Code §§ 9-901, *et seq.;* Va. Code §§ 5.1-152, *et seq; see also* Am. Compl. [Dkt. 37] ¶ 28.  MWAA was constituted as an independent public body governed by an 11-member board, later expanded to 17 members with "seven appointed by the Governor of the Commonwealth of Virginia, four appointed by the Mayor of the District of Columbia, three appointed by the Governor of the State of Maryland, and three appointed by the President of the United States."  D.C. Code § 9-904; Va. Code § 5.1-155.  Virginia and the District individually and jointly conferred "powers and jurisdiction" upon the MWAA, D.C. Code § 9-902; Va. Code § 5.1-153, as were necessary to manage, fund, and develop National and Dulles.  *See* D.C. Code § 9-905; Va. Code § 5.1-156.

The following year, Congress passed the Metropolitan Washington Airports Act of 1986, codified as 49 U.S.C. §§ 49101, *et seq*. (Transfer Act).  This gave the agreement between the District of Columbia and Virginia the status of federal law. *See Tarrant Reg'l Water Dist. v. Herrmann*, 133 S. Ct. 2120, 2130 n.8 (2013).  The Transfer Act recognized the "continuing but

5

limited [federal] interest in the operation of" the airports, as well as the "important and growing" role the airports played in "the commerce, transportation, and economic patterns of Virginia, the District of Columbia, and the surrounding region." 49 U.S.C. § 49101(1), (3).  In light of the "perceived limited need for a Federal role in the management of these airports and the growing local interest," the Act sought to achieve "a transfer of authority from the Federal to the local/State level that is consistent with the management of major airports elsewhere in the United States."  *Id.* § 49101(7).

Congress found that the federal government's interest could be adequately safeguarded "through a lease mechanism which provides for local control and operation" of the two airports. *Id.* § 49101(10).  Accordingly, the Act authorized the Secretary of Transportation to lease the two airports, "including access highways and other related facilities," *id.* § 49102, to MWAA as long as MWAA met certain criteria.  *See id.* § 49106.  The Transfer Act further prescribed minimum terms to be included in the lease.  *See id.* § 49104.  Among other things, the Transfer Act provided that MWAA would "assume responsibility for the [FAA]'s Master Plans for the Metropolitan Washington Airports," *id.* § 49104(a)(6)(A), which contemplated an extension of the existing Washington Metrorail system to Dulles.  *See* Federal Defs. Exh. 1 [Dkt. 88-1] at 2, 123–24, 131.  "On March 2, 1987,

the Secretary of Transportation and MWAA entered into a long-term lease complying with all of the conditions specified in the then recently enacted Transfer Act."  *CAAN*, 501 U.S. at 261.

The Transfer Act also initially provided for a Board of Review composed of nine members of Congress, which was empowered to veto decisions made by MWAA's Board of Directors. *See CAAN*, 501 U.S. at 255.  The Supreme Court held this to be an unconstitutional encroachment by Congress on the sphere of the executive.  *See id*. at 277.  Congress attempted to modify and reconstitute the Board of Review, but this second attempt was likewise held to be unconstitutional.  *See Hechinger v. MWAA*, 36 F.3d 97 (D.C. Cir. 1994).  Accordingly, MWAA is now governed solely by its 17-member Board.

The federal government, however, maintains a limited degree of control over the airports through the Secretary of Transportation.  The Transfer Act provides that "[i]f the Secretary decides that any part of the real property leased to [MWAA] . . . is used for other than airport purposes," the Secretary "shall (i) direct that [MWAA] take appropriate measures to have that part of the property used for airport purposes; and (ii) retake possession of the property if [MWAA] fails to have that part of the property be used for airport purposes within a reasonable period of time, as the Secretary decides."  49 U.S.C. § 49104(a)(2)(C).  "Airport purposes" is

7

defined broadly, and includes "a business or activity not
inconsistent with the needs of aviation that has been approved
by the Secretary." *Id.* § 49104(a)(2)(A)(iv).

### B. The Dulles Toll Road and Metrorail Project

"To facilitate access to what would become Washington
Dulles International Airport . . . the federal government
acquired a broad corridor of land in Virginia, known as the
Dulles Airport Access Highway and Right-of-way[,] . . . between
the Interstate 495 Beltway at Falls Church, Virginia and Dulles
Airport." *Corr v. Metro. Washington Airports Auth.*, 800 F.
Supp. 2d 743, 745–46 (E.D. Va. 2011), *aff'd* 740 F.3d 295 (4th
Cir. 2014). This stretch of land was used to construct the
Dulles Airport Access Highway – "a 13.65–mile highway" used
exclusively "to provide rapid access to and from the Dulles
Airport." *Id.* at 746; *see also* Am. Compl. [Dkt. 37] ¶ 39.

In 1980, Virginia sought and received an easement over
a portion of the federally owned Dulles corridor to construct a
toll road for non-airport traffic. *See Corr v. Metro.
Washington Airports Auth.*, 740 F.3d 295, 297 (4th Cir. 2014)
(*Corr II*); *see also* Am. Compl. [Dkt. 37] ¶ 40. The easement
required that "[t]he roadway . . . be constructed . . . so as to
preserve the median between the eastbound and westbound lanes of
the Dulles Access Highway for future rail service to Dulles

Airport."  MWAA Mot. Exh. 2 [Dkt. 93-2] ¶ 13.  Virginia began
operating the tollway in 1984.  Am. Compl. [Dkt. 37] ¶ 40.

         In the years that followed, "the Virginia General
Assembly repeatedly authorized [the Virginia Commonwealth
Transportation Board] to use toll revenue to fund mass transit
projects within the Dulles Corridor," including the extension of
the Washington Metrorail system to Dulles.  *Corr II*, 740 F.3d at
298.  As MWAA "shared Virginia's goal of extending the Metrorail
system to Dulles Airport" and had assumed the FAA's master
plans, which contemplated such a project, "MWAA proposed to take
control of the Metrorail expansion project, as well as the
Dulles Toll Road which was providing much of the revenue for the
expansion."  *Id.* at 298.  Virginia and MWAA entered into a
Master Transfer Agreement in December of 2006.  *See* MWAA Mot.
Exh. 5 [Dkt. 93-5]; MWAA Mot. Ex. 6 [Dkt. 95-1].  The agreement
required, among other things, that MWAA use revenue from the
tollway to fund the Metrorail project.  MWAA Mot. Exh. 5 [Dkt.
93-5] § 6.01.  Tollway revenues are presently projected to cover
roughly half of the project's cost.  Am. Compl. [Dkt. 37] ¶ 67.
In October of 2008, the Secretary of Transportation certified
that this arrangement between MWAA and Virginia serves a valid
"airport purpose" within the meaning of the Transfer Act.  *See*
Pls. Mot. for Summ. J. Exh. 11 [Dkt. 52-1].

### C.  *Corr v. MWAA*

The toll road agreement between MWAA and Virginia was unsuccessfully challenged in two previous lawsuits brought by Plaintiffs' counsel.  *See Gray v. Virginia Sec'y of Trans.*, 276 Va. 93 (2008); *Corr II*, 740 F.3d 295.  The second of these, *Corr*, was filed in this Court and raised many of the same issues presented here.  Accordingly, this Court made a number of rulings bearing upon the present proceedings.  It held, for example, that the tolls charged by MWAA for use of the tollway are not illegal exactions or taxes but rather are permissible "user fee[s]."  800 F. Supp. 2d at 755.  Similarly, the Court "reject[ed] Plaintiffs' contention that" Congress or the states "impermissibly delegated to an unelected body, MWAA, the authority to tax them."  *Id.* at 756.  The Court further concluded that "MWAA's independence does not violate Plaintiffs' right to a republican form of government," and found "no merit to Plaintiffs' claim that MWAA's governance structure somehow interferes with the President's authority under Article II to ensure that the laws are faithfully executed or violates the Appointments Clause."  *Id.* at 757–58.  Each claim rejected above has some analogue in the present action.[2]

---

[2]     The Court further found that the *Corr* plaintiffs lacked prudential standing, *see* 800 F. Supp. 2d at 754, but the Fourth Circuit ultimately reversed this portion of the Court's ruling.

After this Court dismissed the *Corr* plaintiffs'
complaint, they sought review in the Court of Appeals for the
Federal Circuit.  That Court held that it did not have
jurisdiction to entertain the appeal, as MWAA is not a "federal
instrumentality" subject to the Little Tucker Act, 28 U.S.C.
§ 1346(a)(2).  *Corr v. Metro. Washington Airports Auth.*, 702
F.3d 1334, 1337 (Fed. Cir. 2012) (*Corr I*).  Having found that
"MWAA possesses few, if any, of the hallmarks of a federal
instrumentality identified" by the Supreme Court, the Federal
Circuit transferred the case to the Fourth Circuit.  *Id.* at
1337-38.

The *Corr* plaintiffs fared no better there.  The
primary subject of that appeal was whether Virginia's General
Assembly could legally delegate taxing power to MWAA.  *See Corr
II*, 740 F.3d at 300.  The Fourth Circuit found that MWAA had
levied no tax, and that the tollway constituted a "fee-for-
service" arrangement that did not violate Virginia law.  *See id*.
at 302.  Accordingly, the Fourth Circuit determined that the
*Corr* plaintiffs failed to state a claim and affirmed this
Court's Order dismissing the case.  *See id*. at 302.  The Supreme
Court subsequently denied certiorari.

### D.  The Present Proceedings

Plaintiffs originally filed this putative class action
in the U.S. District Court for the District of Columbia on July

5, 2016.  On September 26, 2016, the U.S. District Court for the District of Columbia transferred the case to this Court.  *See* Mem. Op. and Order [Dkt. 26].[3]

The District of Columbia filed a Notice [Dkt. 44] on December 15, 2016, informing the Court that it would intervene pursuant to Federal Rule of Civil Procedure 5.1(c).  Virginia then filed an amicus brief [Dkt. 83-1] on January 23, 2017, stating that it would not waive its sovereign immunity with respect to this suit and would decline to intervene. Accordingly, the Commonwealth argued that the Court should dismiss this case pursuant to Federal Rule of Civil Procedure 19 for failure to join Virginia as a necessary and indispensable party.  As the Court finds that the case should be dismissed for other reasons, the Court declines to reach this argument.

On December 19, 2016, Plaintiffs filed a Motion for Partial Summary Judgment [Dkt. 46], seeking to resolve issues related to Defendants' liability.  Defendants each responded with Motions to Dismiss [Dkts. 85, 86, 90, 91, 94].  After the hearing on this matter, Plaintiffs filed a Motion for Leave to File Supplemental Authority [Dkt. 127], further addressing the

---

[3]     It bears noting that Judge Jackson transferred the case in part because Plaintiffs' decision to file suit in the District of Columbia "appear[ed] to be the result of forum shopping prompted by plaintiffs' unsuccessful similar challenges brought in the Fourth Circuit."  *See* Mem. Op. and Order [Dkt. 26] at 9 n.1.

absence of Virginia and its import under Federal Rule of Civil Procedure 19.  Having reviewed the parties' filings and heard the arguments of counsel, this matter is now ripe for decision.

## II. Legal Standard

In order to survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  When reviewing a motion brought under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor.  *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted).  "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir.2006)) (alterations in original).

Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). The Court, however, "may properly take judicial notice of matters of public record." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

### III. Analysis

### A. MWAA does not violate the Compact Clause.

Count I of Plaintiffs' Complaint alleges that MWAA did not result from a valid interstate compact under the Compact Clause, U.S. Const. art. I, § 10, cl. 3, because the Clause applies only to "states" and the District of Columbia is not a state. Plaintiffs contend that "[b]ecause MWAA is not a valid interstate compact entity and has no authority under the Compact Clause, MWAA has no legitimate constitutional existence as a governmental body." Am. Compl. [Dkt. 37] ¶ 102.

Article I, section 10, clause 3 of the U.S. Constitution provides in relevant part that "[n]o State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State[.]" "By vesting in Congress the power to grant or withhold consent, or to condition consent on the States' compliance with specified conditions, the Framers sought to ensure that Congress would maintain ultimate supervisory power over cooperative state action that might

14

otherwise interfere with the full and free exercise of federal authority." *Cuyler v. Adams*, 449 U.S. 433, 439–40 (1981). Where an agreement between states would tend to "'increase [the] political power in the states, which may encroach upon or interfere with the just supremacy of the United States,'" congressional approval is required. *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 468 (1978) (quoting *Virginia v. Tennessee*, 148 U.S. 503, 518 (1893)).

"Congressional consent," however, "is not required for interstate agreements that fall outside the scope of the Compact Clause." *Cuyler*, 449 U.S. at 440. The Clause is "not to be construed to limit the variety of arrangements which are possible through the voluntary and cooperative actions of individual States with a view to increasing harmony within the federalism created by the Constitution." *People of State of N.Y. v. O'Neill*, 359 U.S. 1, 6 (1959).

The Compact Clause serves as a limitation on state power. If, as Plaintiffs contend, the District is not a "state" within the meaning of the Compact Clause, then the Compact Clause limitation does not apply to the District. That would leave the District *more*, not less, free to make agreements with states. The District would not, as Plaintiffs claim, lack some positive "authority" to enter into interstate agreements conferred by the Compact Clause. *See* Am. Compl. [Dkt. 37]

15

¶ 102.  The only case Plaintiffs cite to support their contrary position, *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010), does not so much as suggest what Plaintiffs claim it holds.

There can be little doubt that Congress delegated to the District the power to enter into agreements with states generally.  Congress enjoys "plenary" freedom in the District of Columbia to "exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes."  *Palmore v. United States*, 411 U.S. 389, 397 (1973); *see also Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 435 (1932) (Congress enjoys "all the powers of legislation which may be exercised by a state in dealing with its affairs" in the District).  Except as limited by the Compact Clause, state legislatures are generally free to undertake "voluntary and cooperative actions" with other states.  *O'Neill*, 359 U.S. at 6.  Congress has delegated its legislative power under the District Clause, U.S. Const. art. I, § 8, cl. 17, to the District – including the ability to "contract and be contracted with," D.C. Code § 1-102 – and did so "subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States," D.C. Code § 1-203.02, including the Compact

Clause.[4]  The District may therefore participate in "voluntary and cooperative" interstate endeavors, *O'Neill*, 359 U.S. at 6, in much the same manner as a state.[5]

Plaintiffs' brief arguments to the contrary in their Reply are unsupported and unconvincing.  First, Plaintiffs argue that because the Home Rule Act delegated legislative power with respect to "all rightful subjects of legislation *within* the District," D.C. Code § 1-203.02 (emphasis added), the District's authority does not extend to legislation touching on matters *outside* of the District.  It is not clear that home rule would be possible in the District of Columbia were the Court to accept this strained reading of the Home Rule Act.  *See, e.g.*, D.C. Code Ann. §§ 7-2331, *et seq.* (interstate agreement providing for mutual aid and disaster relief in emergencies); D.C. Code § 9-1117.01 (interstate agreement providing for management of bridges into and out of the District).  Moreover, Plaintiffs' interpretation conflicts with the latter half of the cited

---

[4]      Notably, "there is no constitutional barrier to the delegation by Congress to the District of Columbia of [its] full legislative power" within the District.  *D.C. v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953).

[5]      The Court notes that the District in fact participates in numerous interstate agreements, including other federally recognized interstate compacts.  *See* Fed. Dfs. Mem. in Supp. of Mot. to Dismiss [Dkt. 88] at 25 n.12.  Plaintiffs assert that other interstate compacts including the District are valid because they involve two or more states in addition to the District.  Plaintiffs, however, fail to cite any supporting authority and make no attempt to explain their position.

provision, which states that the District's legislative power is "subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States."  D.C. Code § 1-203.02.  Much of this part of the Constitution, including the Compact Clause, governs the activities of a state touching on matters beyond its own borders.  Plaintiffs' novel interpretation of the Home Rule Act would render this statutory provision mere surplusage, in addition to producing absurd results.

Plaintiffs argue further that "Congress cannot constitutionally delegate to the District the powers of a state as a member of the Union," as this "would violate Art. IV, § 3, which provides the procedures for admitting new States."  Pls. Rep. [Dkt. 103] at 27.  This is a non sequitur.  The question before the Court is not whether Congress could have delegated all powers attendant statehood to the District of Columbia, but whether it has permissibly delegated the power at issue here – to wit, the power to enter into agreements with states.  As discussed above, Congress could and did delegate this power to the District.  This ability is not uniquely reserved to "member[s] of the Union."  Indeed, it is freely exercised by private and governmental actors of all stripes.  While Plaintiffs argue that agreements between states are somehow qualitatively different from other agreements, the case upon

18

which they rely for that proposition itself states otherwise.
*See Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 105
(3d Cir. 2008) (finding that an interstate compact is a contract
subject to the general principles of contract law).

In light of the above, the Court finds Plaintiffs'
Compact Clause claim puzzling.  Assuming that the Compact Clause
applies to the interstate agreement creating MWAA, Congress gave
its express consent through the Transfer Act.  The Clause's
requirements are thus satisfied.  If, on the other hand,
Plaintiffs are correct and the Compact Clause does not apply,
then Congress' consent was unnecessary and irrelevant for
purposes of the Compact Clause.  *See Cuyler*, 449 U.S. at 440.
Either way, the Compact Clause casts no doubt on the legality of
MWAA or its actions.

Plaintiffs respond only that "MWAA purports to be a
*compact entity*" and so "must stand or fall as such."  Pls. Rep.
[Dkt. 103] at 27.  Plaintiffs, however, again provide no support
for this bald assertion, and the Court fails to see its logic.
As discussed above, the Compact Clause does not confer any
positive authority on entities constituted as interstate
compacts.  Nor, for that matter, does it penalize entities that
falsely "purport" to be interstate compacts.

If Plaintiffs mean to imply that Congress cast doubt
on MWAA's validity by treating it as an interstate compact and

19

passing the Transfer Act, this argument turns the Compact Clause on its head.  It treats the Clause as a limitation on *Congress'* power – as backward a reading of that constitutional provision as can be.  *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 71 (D.D.C. 2016).  As MWAA aptly points out, the Compact Clause "does not say, nor has it ever been read to mean, that Congress may only consent to compacts between States of the Union."  MWAA Rep. [Dkt. 115] at 8.  In the absence of such a restriction, Congress was plainly empowered to enact the Transfer Act.  *See, e.g.*, U.S. Const. art. I, § 8, cl. 18.

Were it necessary to reach the question, however, the Court would find that the District of Columbia is a "state" within the meaning of the Compact Clause.  "Whether the District of Columbia constitutes a 'State or Territory' within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved."  *District of Columbia v. Carter*, 409 U.S. 418, 420 (1973).  The object of the Compact Clause is to safeguard federal supremacy in matters of federal interest from intrusion by the states.  *See Cuyler*, 449 U.S. at 439–40.  The federal government has delegated legislative autonomy to the District of Columbia comparable to that of a state.  Subject to certain restrictions, the District may use that power to do things with which the federal government disagrees.  *See, e.g.*, William

Cummings, *Pot Now Legal in D.C. Despite Threats from Congress*, USA Today (Feb. 25, 2015), https://tinyurl.com/ltf96ql.  Indeed, the fact that Congress delegated legislative power to the District "subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States," D.C. Code § 1-203.02, demonstrates that Congress intended to delegate a degree of autonomy to the District giving rise to Compact Clause concerns. Construing the Compact Clause to exclude the District of Columbia would therefore be contrary the Clause's purpose.  But again, this has little bearing on MWAA's legitimacy, as Congress consented to MWAA's creation and so satisfied the Compact Clause's requirements.[6]

In sum, the Compact Clause does not provide an avenue for Plaintiffs to attack MWAA's legitimacy.  Accordingly, Count I of Plaintiffs' Amended Complaint fails to state a claim upon which relief may be granted.

---

[6]     At the hearing on this matter, Plaintiffs argued without support that the District of Columbia is merely the federal government's agent.  Courts, however, have generally reached the opposite conclusion.  *See, e.g.*, *Sindram v. United States*, 67 Fed. Cl. 788, 794 (2005) ("[A]s a matter of law, the District of Columbia is not an agent of the United States Government."); *cf. United States v. Jackson*, 163 F.3d 599 (4th Cir. 1998) ("Courts addressing this issue have consistently held that the District of Columbia is not a department or agency of the United States.").

Count II of Plaintiffs' Amended Complaint also ostensibly arises under the Compact Clause.  The wide-ranging allegations under that heading invoke a variety of doctrines having little to do with the Compact Clause.  Ultimately, Plaintiffs posit that "the federal authority delegated to MWAA is improper under the Compact Clause," and MWAA's authority "cannot flow from the Compact Clause, which is MWAA's only claimed source of power to exercise that authority."  Am. Compl. [Dkt. 37] ¶ 110.  This, again, misreads the Compact Clause as more than a limitation on the ability of states to enter into agreements that might encroach upon federal interests.  *See Cuyler*, 449 U.S. at 440.  Moreover, as discussed more fully below, MWAA's power is not federal in nature.  The Court therefore finds that Count II of Plaintiffs' Amended Complaint likewise fails to state a claim.

### B. MWAA does not exercise federal power.

Counts III through V of Plaintiffs' Amended Complaint allege, in various formulations, that the federal government has improperly delegated federal authority to MWAA.  As Plaintiffs concede, Counts III, IV, and V of their Amended Complaint rest on "the premise that MWAA exercises federal power."  Pl. Mem. in Supp. of Mot. for Partial Summ. J. [Dkt. 8] at 8.  The Court rejects that premise.

Plaintiffs argue first that the Supreme Court held in *CAAN*, 501 U.S. 252, that "members of MWAA's Board are federal 'officers' exercising federal power."  Pl. Mem. in Supp. of Mot. for Partial Summ. J. [Dkt. 8] at 9.  That is simply false.  *CAAN* did not concern MWAA's Board, but rather its now-defunct Board of Review.  The latter was empowered to overturn the decisions of MWAA's Board and was composed of "nine Members of the Congress, eight of whom serve[d] on committees with jurisdiction over transportation issues and none of whom [was] a Member from Maryland, Virginia, or the District of Columbia[.]"  *CAAN*, 501 U.S. at 259.  Congress insisted on the Board of Review to alleviate the concern of some members that "by leasing [National and Dulles] to a local authority, [Congress] would be losing control over them" entirely.  *Id.* at 268 (quoting 132 Cong. Rec. 32143 (1986) (statement of Rep. Hammerschmidt)).

The Supreme Court found the Board of Review to be an agent of Congress that either (1) improperly exercised federal executive power or (2) failed to observe the bicameral and presentment procedures necessary to exercise federal legislative power.  *See id*. at 274.  The Court did not address whether MWAA itself exercises federal power.  The Court did, however, strongly suggest the opposite, concluding that the Board of Review was a mechanism through which "Congress imposed its will on the regional authority created by the District of Columbia

23

and the Commonwealth of Virginia." *Id.* at 276.  The characteristic of the Board of Review the Supreme Court deemed "[m]ost significant" to its analysis – the limitation of membership to representatives of Congress – is not shared by MWAA's Board. *See id.* at 266-67.[7]

The only Court to have squarely considered whether MWAA exercises federal power concluded that it does not.  As discussed above, the Federal Circuit found in *Corr I* that "MWAA possesses few, if any, of the hallmarks of a federal instrumentality identified" by the Supreme Court.  702 F.3d at 1337-38.  That court noted that "though it may partly owe its existence to an act of Congress, MWAA was in large part created by, and exercises the authority of, Virginia and the District of Columbia." *Id.* at 1337.  Furthermore, "while MWAA does serve limited federal interests, it serves regional and state interests as well." *Id.*  Finally, the court found that MWAA is not subject to meaningful federal control. *See id.*  The court thus concluded that the factors identified by the Supreme Court

---

[7]     In their Reply, Plaintiffs contend that MWAA's Board "inherited the Board of Review's powers."  Pls. Rep. [Dkt. 103] at 4.  It is unclear how MWAA's Board could inherit the power to veto its own decisions.  Regardless, MWAA's Board certainly did not inherit the seats in Congress held by members of the Board of Review.  The Court fails to see how the loss of a federal layer of review over MWAA's actions somehow transformed "the regional authority created by the District of Columbia and the Commonwealth of Virginia" into an agent of Congress like the Board of Review. *CAAN*, 501 U.S. at 276.

in cases like *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397–98 (1995), demonstrate that MWAA is not federal in nature.  *Corr I*, 702 F.3d at 1338.

Independently applying the *Lebron* factors, the Court agrees with the Federal Circuit's reasoning.  First, MWAA was created by legislation enacted by the District of Columbia and Virginia.  *See* D.C. Code §§ 9-901, *et seq.*; Va. Code §§ 5.1-152, *et seq.*  Throughout their various filings, Plaintiffs mischaracterize the nature of Congress' contribution, contending that the Transfer Act conferred upon MWAA its various powers. *See, e.g.*, Pls. Rep. [Dkt. 103] at 5.  It did not.  The Transfer Act instead merely recognized and consented to the powers conferred upon MWAA by Virginia and the District of Columbia. *See Corr I*, 702 F.3d at 1337 ("The Airports Act, however, represents Congressional approval of Virginia's and the District of Columbia's compact-legislation authorizing the establishment of MWAA rather than the creation of the Authority in the first instance."); *see also Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1365 (9th Cir. 1986) ("As with any compact, congressional consent did not result in the creation but only authorized the creation of the compact organization and the appointment of its officials.").  Indeed, the Transfer Act itself expressly recognizes that MWAA exercises powers "conferred upon it jointly

25

by the legislative authority of Virginia and the District of Columbia," not federal authority delegated via the Transfer Act. 49 U.S.C. § 49106(a)(1)(A).

Plaintiffs argue that, notwithstanding that fact, "MWAA's history tells the story of a body shaped, authorized and overseen by Congress at every step." Pls. Rep. [Dkt. 103] at 6. Plaintiffs essentially argue that MWAA was foisted upon Virginia and the District by the federal government. This, however, elides the legislative history underpinning, and congressional findings accompanying, the Transfer Act. For example, MWAA was proposed by a commission composed primarily of representatives of Virginia, Maryland, and the District, *see* 131 Cong. Rec. S9608, S9609, and enjoyed strong regional support. *See, e.g*, Commonwealth of Virginia Amicus Curiae Brief in Support of Dismissal [Dkt. 83-1] at 1-4. The Transfer Act itself states that the impetus for MWAA's creation was the "perceived limited need for a Federal role in the management of [National and Dulles] and the growing local interest" in the same. 49 U.S.C. § 49101(7). While the federal government played a role in MWAA's creation, that role was not so dominant as to somehow render MWAA a *de facto* federal entity.

Similarly, Plaintiffs contend that "MWAA was created to pursue Congress's policy goals." Pls. Rep. [Dkt. 103] at 8. There is some truth to that. The policy goal in question,

26

however, was that of relinquishing control of National and Dulles to an entity operating at the "local/State level."  49 U.S.C. § 49101(7).  As discussed above, this was a policy goal shared by Virginia and the District of Columbia.  It is difficult to see how an entity created in the pursuit of this particular policy would be federal in nature, rather than a "local/State" creation.  *Id.*  "[T]he fact that federal and state entities act toward a common goal does not convert the state — or interstate — body into a federal one."  *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 533 (2d Cir. 2010).[8]

Plaintiffs argue further that by managing federal property, MWAA "serves a function expressly granted to *Congress* by the Constitution, namely, to make 'Rules and Regulations respecting the Territory or other Property Belonging to the United States[.]'"  Pls. Rep. [Dkt. 103] at 7 (quoting U.S. Const. Art. 1, § 3, cl. 2).  But as Plaintiffs concede, *see id.* at 8, the mere fact that MWAA leases federal property does not transform it into a federal instrumentality.  *See Buckstaff Bath House Co. v. McKinley*, 308 U.S. 358, 362 (1939); *see also United*

---

[8]      Plaintiffs also argue that both the federal government and the Commonwealth of Virginia have made isolated statements in other cases indicating that MWAA exercises federal power. Plaintiffs, however, do not contend that Defendants are estopped from arguing otherwise, or that the Court is somehow bound to follow these prior statements.  As such, it's not clear that the prior statements have any bearing on the present proceedings.

*States v. Muskegon Twp.*, 355 U.S. 484, 486 (1958) (holding that operation of federally-owned manufacturing plant did not render a private company a federal instrumentality).

Plaintiffs press the point nonetheless, contending that MWAA is not a typical lessee as it was "created on the Federal Government's terms to exercise the federal Congress's own power over federal property[.]"  Pls. Rep. [Dkt. 103] at 8. As discussed above, that is not an accurate description of MWAA. Regardless, Plaintiffs fail to explain how MWAA exercises power reserved to Congress more than any other lessee of federal property.  There is nothing inherently "federal" about the operation of National and Dulles.  With the exception of National and Dulles, the federal government has never owned or operated major commercial airports.  *See CAAN*, 501 U.S. at 256. Indeed, it seems that part of the impetus for MWAA's creation was a general sense that the federal government has little business running a commercial airport.  *See* 131 Cong. Rec. S9608 (noting that "[b]y 1948, [National] was identified as inappropriate for operation as a conventional federal agency," and "many attempts were made to reorganize first National, and later both National and Dulles into a government corporation" before the United States ultimately transferred control of the airports to a local authority).  Congress itself recognized in the Transfer Act that federal control of a major commercial

airport is anomalous, reasoning that transferring control of
National and Dulles to the "local/State level" would be more
"consistent with the management of major airports elsewhere in
the United States."  49 U.S.C. § 49101(7).  If anything,
operating commercial airports like National and Dulles is a
distinctly *un*-federal activity.

Proceeding to the next *Lebron* consideration, MWAA
serves predominantly state and local, rather than federal,
interests.  Although the Supreme Court in *CAAN* observed that
Congress has a "strong and continuing interest in the efficient
operation of" National and Dulles, 501 U.S. at 266, Congress
found its own interest to be "limited" relative to the
"important and growing" role the airports play in "the commerce,
transportation, and economic patterns of Virginia, the District
of Columbia, and the surrounding region."  49 U.S.C. § 49101(1),
(3); *cf. Corr I*, 702 F.3d at 1337 ("[W]hile MWAA does serve
limited federal interests, it serves regional and state
interests as well.").  This conclusion is, frankly,
commonsensical; while National and Dulles do undoubtedly serve
members of Congress traveling to and from their home districts,
the airports far more frequently serve the many residents of the
Washington, D.C., metropolitan area.  It was recognized when
MWAA was first proposed that the state and local governments of
the Washington, D.C., metropolitan area are "the parties

principally interested in the operation" of the airports.   131

Cong. Rec. S9609.  As stated by then-Governor of Virginia Gerald

Baliles in testimony before a congressional subcommittee,

National and Dulles are "critical" to Virginia as "Virginia's

most heavily-used gateway."  Proposed Transfer of Metro. Wash.

Airports: Hearings Before the Subcomm. on Aviation of the H.

Comm. on Pub. Works and Transp., 99th Cong. 4, 9-10 (1986).  The

same likely can be said of the District.  The very nature of the

arrangement struck between the federal government, Virginia,

Maryland, and the District of Columbia reflects that the balance

of interests tips local, with the federal government's "limited"

interest safeguarded only "by a lease mechanism which provides

for local control and operation."  49 U.S.C. § 49101(3), (10).

        As for the final *Lebron* considerations, 513 U.S. at

397–98, the federal government has little say in MWAA's

operations.[9]  MWAA was deliberately constituted as a local

authority that operates "independent of . . . the United States

Government."  49 U.S.C. § 49106(a)(2).  While the President

appoints three members of MWAA's Board, that is only a small

minority of the Board's 17 members.  *See* D.C. Code § 9-904; Va.

Code § 5.1-155.  This is a mundane feature among interstate

---

[9]        The Court notes that Plaintiffs' various arguments
with respect to federal control of MWAA are inconsistent with
Plaintiffs' other claims, which generally bemoan MWAA's
*unaccountability* to the federal government.  *See, e.g.*, Am.
Compl. [Dkt. 37] ¶¶ 4-5.

compacts, *see, e.g.*, *State ex rel. Dyer v. Sims*, 341 U.S. 22, 27-28 (1951), and is not sufficient to demonstrate that MWAA is federally controlled.

The greatest formal authority the United States retains over MWAA is the power to enforce the terms of the airport lease. *See* 49 U.S.C. § 49104(a)(2)(C). As Plaintiffs concede, however, that is little enough power, *see* Am. Compl. [Dkt. 37] ¶ 48, and no more than any lessor retains over a lessee. As discussed above, the mere fact that MWAA leases federal property is not enough to transform it into a federal instrumentality. *See Buckstaff Bath House Co.*, 308 U.S. at 362.

Plaintiffs argue further that MWAA is a *de facto* federal entity because it operates under federal control in practice. Plaintiffs, however, provide little evidence of federal control – none of it compelling. Plaintiffs point out that the District and Virginia twice amended their laws concerning MWAA in tandem with Congress. *See* Pls. Rep. [Dkt. 103] at 5. Such coordination, however, does not demonstrate congressional control – particularly as one of the amendments resulted from court decisions holding the amended portion to be unconstitutional. *See CAAN*, 501 U.S. at 277; *Hechinger*, 36 F.3d at 105. Relatedly, the Court notes that Congress has twice tried, and failed, to "impose[ ] its will on the regional authority created by the District of Columbia and the

31

Commonwealth of Virginia" through a Board of Review. *CAAN*, 501 U.S. at 276; *see also Hechinger*, 36 F.3d 97. Those efforts make little sense if Congress in fact controls MWAA in the absence of a Board of Review.

Plaintiffs contend further that the Department of Transportation has recently subjected MWAA's operations to a degree of "general oversight." *See* Pls. Rep. [Dkt. 103] at 5-6. But Department of Transportation oversight is simply not the same as meaningful federal control. Indeed, that is, to a degree, *the very premise* of Plaintiffs' lawsuit. *Cf.* Am. Compl. [Dkt. 37] ¶ 48 ("Neither the Transfer Act nor the Airports Lease creates any mechanism or procedure by which the Secretary is in a position to effectively supervise MWAA, or otherwise to practically enforce the Lease terms.").

This relatively minor federal involvement sets MWAA well apart from entities that courts have deemed to be *de facto* federal instrumentalities. Plaintiffs, for example, compare MWAA to Amtrak. *See* Pls. Rep. [Dkt. 103] at 5. Whereas the vast majority of MWAA's Board is appointed by state and local authorities, *see* Va. Code § 5.1-155; D.C. Code § 9-904, nearly all of Amtrak's Board is appointed by the President and confirmed by the Senate. *See Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S. Ct. 1225, 1231 (2015). Amtrak's Board members must additionally meet qualifications set by federal law, and

32

are paid salaries subject to limits set by Congress.  *Id.*  While MWAA was constituted by Virginia and the District as a local governmental body, *see* Va. Code § 5.1-153; D.C. Code § 9-902, Amtrak was constituted as a corporation, with "[t]he Secretary of Transportation hold[ing] all of Amtrak's preferred stock and most of its common stock[.]"  *Ass'n of Am. Railroads*, 135 S. Ct. at 1231.  Congress is largely uninvolved in MWAA's day-to-day activities.  *See, e.g.*, 49 U.S.C. § 49106(a)(2); *see also* Pls. Mem. in Supp. of Mot. for Partial Summ. J. [Dkt. 8] at 15-19 (arguing that MWAA's discretion is not meaningfully constrained by federal law).  Amtrak, on the other hand, is subject to far more thorough requirements set by federal law, ranging from general policies Amtrak must pursue to specific train routes it must maintain.  *See Ass'n of Am. Railroads*, 135 S. Ct. at 1232. Finally, unlike MWAA, which receives federal grants on the same basis as any other airport authority, Amtrak is "dependent on federal financial support."  *Id*.  The contrast is so stark that the Court is surprised Plaintiffs would invite the comparison.

Finally, Plaintiffs argued at the hearing on this matter that MWAA wields federal power because its authority derives in part from the District of Columbia, and the District's authority in turn comes from Congress.  The District's authority, however, is generally understood to be local, rather than federal, in nature.  *See, e.g.*, *LaShawn A. v.*

*Barry*, 87 F.3d 1389, 1396 (D.C. Cir. 1996) (noting that D.C. law is "local" rather than "federal").

At the very least, the District's authority is not "federal" in any sense that would subject MWAA to Plaintiffs' separation of powers challenge.  Although Congress delegated legislative power to the District, Congress possesses a "dual authority over the District."  *Keller v. Potomac Elec. Power Co.*, 261 U.S. 428, 443 (1923).  Where the District is concerned, Congress may legislate in its capacity as a national body, or it may legislate using its unitary, "plenary" authority to "exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes."  *Palmore*, 411 U.S. at 397.  It is this latter power that Congress delegated to the District.  This unitary authority is not subject to the Constitution's separation of powers requirements, whether wielded by Congress, the District, or MWAA.  *See Techworld Dev. Corp. v. D.C. Pres. League*, 648 F. Supp. 106, 116–17 (D.D.C. 1986), *vacated as moot*, No. 86-5630, 1987 WL 1367570 (D.C. Cir. June 2, 1987).

In light of the above, the Court finds that MWAA is not a federal instrumentality exercising federal power.  As Counts III, IV, and V of Plaintiffs' Amended Complaint rest on "the premise that MWAA exercises federal power," Pls. Mem. in

Supp. of Mot. for Partial Summ. J. [Dkt. 8] at 8, those Counts
fail as a matter of law.

### C. Tolls charged by MWAA are not illegal exactions, and Plaintiffs fail to state a Section 1983 claim.

Count VI of Plaintiffs' Complaint alleges that tolls
charged by MWAA are illegal exactions that violate the Due
Process Clause of the Fifth Amendment.  The legal basis for this
claim is unclear.  Indeed, the parties are unable to agree as to
the body of law under which the claim arises.  The Court notes
that Plaintiffs' counsel brought a similar claim in *Corr* that
engendered similar confusion.  *See Corr II*, 740 F.3d at 299.

Regardless, as in *Corr*, the Court need not resolve the
confusion.  The Court gleans that – as in *Corr* – Plaintiffs'
illegal exaction claim is not freestanding, but rather is
"parasitic on" Plaintiffs' other claims.  *Corr II*, 740 F.3d at
300.  It posits that MWAA collected money from Plaintiffs while
operating illegally, and so that collection of money was itself
illegal.  Plaintiffs' illegal exaction claim can therefore only
succeed if the Court rules in Plaintiffs' favor on some other
count of Plaintiffs' Amended Complaint.  Plaintiffs conceded as
much at oral argument.  As the Court finds that the other counts
of Plaintiffs' Amended Complaint lack merit, Plaintiffs' illegal
exaction claim also fails.

Similarly, Count XI of Plaintiffs' Amended Complaint alleges that MWAA violated 42 U.S.C. § 1983 based on the constitutional claims discussed and rejected above.  As Plaintiffs failed to "prove a violation of the underlying constitutional right," Plaintiffs have failed to state a claim under Section 1983.  *Daniels v. Williams*, 474 U.S. 327, 330 (1986).

> ### D. **MWAA has not violated the Transfer Act or the airport lease.**

Counts VII and VIII of Plaintiffs' Amended Complaint allege that MWAA has violated the Transfer Act and the lease under which it operates National and Dulles.  These claims are effectively identical, as the Transfer Act dictates the pertinent terms of the lease.  *See* 49 U.S.C. § 49104(a).[10]

Plaintiffs contend that MWAA has contravened three provisions of the Transfer Act.  First, Plaintiffs argue that MWAA has failed to use the leased premises "only for airport purposes" as required by 49 U.S.C. § 49104.  Second, Plaintiffs claim that MWAA has failed to abide by 49 U.S.C. § 49104(a)(3),

---

[10]       The Act provides a private cause of action allowing "an aggrieved party" to "compel the Airports Authority and its officers and employees to comply with the terms of the lease." 49 U.S.C. § 49104(c).  Courts have interpreted this provision as "limit[ing] the remedies available" for violations of the lease and Transfer Act "to equitable relief necessary to enforce compliance with the Lease." *LTMC/Dragonfly, Inc. v. Metro. Washington Airports Auth.*, 699 F. Supp. 2d 281, 295 (D.D.C. 2010).

which requires that "all revenues generated by the [MWAA] . . .
be expended for the capital and operating costs of" National and
Dulles.  Finally, Plaintiffs claim that MWAA has violated 49
U.S.C. § 47107(a)(13)(A), which requires MWAA to set "charges
for the use of facilities . . . that will make the airport as
self-sustaining as possible."

At the hearing on this matter, Plaintiffs expressly
abandoned their claim that MWAA's activities have not served
"airport purposes" within the meaning of 49 U.S.C. § 49104.  As
such, the Court will dismiss Plaintiffs' claims insofar as they
rest on that provision of the Transfer Act.

Plaintiffs' second argument, that MWAA has failed to
spend "all revenues generated" on "the capital and operating
costs of" National and Dulles, *id.* § 49104(a)(3), takes issue
with MWAA's contributions to the Silver Line Metro project and
funds MWAA has put toward improving roads in and around the
Dulles Corridor.  What constitutes a capital cost is not defined
in the airport lease or the Transfer Act.

Both the lease and Transfer Act, however, require MWAA
to assume responsibility for the FAA's Master Plans.  *See* 49
U.S.C. § 49104(a)(6)(A).  Those Master Plans expressly
contemplate the extension of rail service to Dulles.  *See*
Federal Defs. Exh. 1 [Dkt. 88-1] at 2, 123-24, 131.  Plaintiffs
apparently concede that MWAA's contributions to the Silver Line

37

Metro project are in keeping with the Master Plans, and that MWAA's efforts to improve Route 7 and Spring Hill Road are incidental to the Silver Line project. *See* MWAA Exh. 12 [Dkt. 98-3] at ¶ 1.3.3.  Plaintiffs' argument that these are not "capital costs" under the lease and Transfer Act would therefore have the Court construe the term so narrowly that it would exclude this project *expressly contemplated* by the lease and Transfer Act.  MWAA would effectively be advised to pursue, while at the same time forbidden to pursue, these projects. That cannot be a proper construction of the lease and Transfer Act.

Plaintiffs rejoin only that these improvements cannot constitute "capital costs" because they will incidentally benefit a large number of non-airport users.  For example, Plaintiffs claim that only a relatively small fraction of the people served by the Silver Line will, on a given day, use the Silver Line to reach Dulles.  *See* Mem. in Supp. of Mot. for Summ. J. [Dkt. 47] at 24.  As a matter of logic, it is hard to see why this matters.  This incidental benefit to third parties in no way diminishes the improvement to Dulles wrought by rail accessibility.  It would be difficult – perhaps impossible – to provide effective rail service to the airport without conferring such a benefit on third parties.

Moreover, Plaintiffs cite no authority for the proposition that a capital expenditure cannot incidentally benefit third parties.  Ordinarily, a capital expenditure is simply "[a]n outlay of funds to acquire or improve a fixed asset."  CAPITAL EXPENDITURE, Black's Law Dictionary (10th ed. 2014).  The fact that the Silver Line will benefit non-airport users does not take it outside this definition.  The Court notes that the federal government – the lessor itself – has already certified that the Silver Line project meets the requirements of the lease and Transfer Act, *see* Pls. Mot. for Summ. J. Exh. 11 [Dkt. 52-1] at 3, including the requirement that "all revenues generated by the [MWAA] . . . be expended for the capital and operating costs of" National and Dulles.  *See* 49 U.S.C. § 49104(a)(3).  Plaintiffs provide no compelling reason to second-guess the lessor's construction of its own lease.

Plaintiffs similarly take issue with MWAA's improvements to Route 606 in and around the Dulles Corridor. Route 606 lies partially on land leased to MWAA, and the improvements to it are intended to enhance access to both Dulles and the Dulles Toll Road.  *See* Pls. Exh. 35 [Dkt. 65-1] at 199. At the hearing on this matter, Plaintiffs' counsel conceded that capital expenditures need not pertain to assets resting entirely on property leased to MWAA.  It is therefore difficult to see why MWAA's expenditures on Route 606 would not constitute

39

capital costs under the airport lease and Transfer Act.  The
Court therefore finds that Plaintiffs have failed to demonstrate
that MWAA violated 49 U.S.C. § 49104(a)(3) through its various
efforts to improve access to Dulles.

Plaintiffs next argue that MWAA has violated 49 U.S.C.
§ 47107(a)(13)(A) by failing to "make the airport as self-
sustaining as possible."  Plaintiffs claim that this is so
because "the obvious way to do that, if there are excess
revenues, is to put those revenues in a trust fund or analogous
account so they can be used to meet future expenses of airport
facilities[.]"  Am. Compl. [Dkt. 37] ¶ 174; *see also* Mem. in
Supp. of Mot. for Partial Summ. J. [Dkt. 47] at 25.

Simply characterizing a conclusion as "obvious,"
however, does not make it so.  Nor, for that matter, does it
suffice to survive a Rule 12(b)(6) motion.  Plaintiffs offer no
evidence, analysis, or authority.  Instead, they merely state
their conclusion that MWAA could pursue a broad statutory
directive more effectively and invite Defendants to prove them
wrong.  But it falls to Plaintiffs to state a viable claim for
relief.  *See, e.g., Iqbal*, 556 U.S. at 678.  Plaintiffs fail to
put forth sufficient factual matter or analysis to meet that
obligation.  They instead merely quibble with MWAA's business
judgment.

If, as Plaintiffs claim, MWAA could *only* satisfy its obligations under 49 U.S.C. § 47107(a)(13)(A) by putting excess revenue in a trust fund, the lease and Transfer Act would say so.  Instead, the lease and Transfer Act entrust MWAA with discretion.  Plaintiffs have established they would exercise that discretion differently.  That, however, does not demonstrate MWAA has violated 49 U.S.C. § 47107(a)(13)(A), notwithstanding Plaintiffs' apparent confidence that they know best how to run Dulles.[11]

In sum, Plaintiffs have failed to sufficiently allege any violation of the Transfer Act and airport lease.  The Court will therefore dismiss Counts VII and VIII of Plaintiffs' Amended Complaint.

### E. Plaintiffs fail to state a claim under the APA.

Finally, Plaintiffs allege in Counts IX and X of their Amended Complaint that MWAA, the Department of Transportation, and the Secretary have all violated the APA.  *See* Mem. in Supp. of Mot. for Partial Summ. J. [Dkt. 47] at 25.  The Court disagrees.

First, as discussed above, MWAA is not a federal instrumentality.  It is therefore not an "authority of the

---

[11]     The Court notes that it is in fact not "obvious" that using excess funds to improve public access to Dulles will make the airport less sustainable than Plaintiffs' vague "trust fund or analogous account."

Government of the United States," 5 U.S.C. § 551(1), subject to the APA.  *See also Atl. States Marine Fisheries Comm'n*, 609 F.3d at 532-33 (finding that interstate compacts are generally not subject to the APA).

Plaintiffs press the point nonetheless, arguing that the "APA applies to quasi-agencies like interstate compact entities that are imbued with a special federal interest[.]" Mem. in Supp. of Mot. for Partial Summ. J. [Dkt. 47] at 27.  The Court concludes that, for the reasons discussed above, Plaintiffs have failed to show that MWAA is imbued with any special federal interest that would justify subjecting MWAA to the APA.

Regardless, neither this Court nor the Fourth Circuit has embraced the "quasi-federal agency" doctrine advanced by Plaintiffs.  Indeed, the Fourth Circuit has implicitly rejected it.  *See United States v. Saunders*, 828 F.3d 198, 205 (4th Cir. 2016) (citing with approval the Second Circuit's rejection of the "quasi-federal agency" doctrine in N*ew York v. Atlantic States Marine Fisheries Commission*, 609 F.3d 524, 527 (2d Cir. 2010)).  In the case Plaintiffs cite, *Seal & Co. v. Washington Metropolitan Area Transit Authority*, 768 F. Supp. 1150, 1154 (E.D. Va. 1991), this Court explained that "the agency involved — WMATA — is not a federal agency" and so "is not subject to the APA," but noted the reasoning of two other courts finding that

"WMATA should be treated as a federal agency subject to the APA with respect to standing" in certain circumstances. *Id.* at 1155. Judge Ellis did not endorse this conclusion, and the Court finds the limited reasoning of the cases discussed in *Seal & Co.* unpersuasive. Having found that MWAA does not exercise federal power, it would be inappropriate to subject it to a law intended to restrain federal power. *See Atl. States Marine Fisheries Comm'n*, 609 F.3d at 532-33.

It is unclear whether Plaintiffs still maintain their APA claim against the federal defendants. As discussed above, at the hearing on this matter Plaintiffs abandoned their argument that MWAA's activities do not serve valid "airport purposes" within the meaning of 49 U.S.C. § 49104. Plaintiffs' APA claim against the federal defendants rests upon this argument. Having abandoned the argument without qualification at the hearing, the Court is inclined to deem it withdrawn for all purposes.

Regardless, Plaintiffs' APA claim against the federal defendants is both time barred and meritless. First, as the federal defendants note, there is a significant gulf between the claim contemplated in Plaintiffs' Amended Complaint and the claim advanced in Plaintiffs' briefs. Plaintiffs' Amended Complaint specifically challenges "final agency action" under 5 U.S.C. § 706(2) – to wit, the Secretary's 2008 "certif[ication]

that MWAA's operation of the Toll Road and its use of toll revenue to fund construction of the Metrorail Project were valid 'airport purposes' within the meaning of the MWAA lease."  Am. Compl. [Dkt. 37] ¶¶ 195-98.  A claim based on agency action that occurred in 2008, however, is now time-barred by the APA's six-year statute of limitations.  *See Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999).

Perhaps recognizing their error, Plaintiffs' briefs reframe their APA claim as challenging agency action *unlawfully withheld* under 5 U.S.C. § 706(1).  As reformulated in Plaintiffs' briefs, the Secretary is committing an ongoing violation of the APA by refusing to recognize that MWAA is using airport property for other than "airport purposes."

"It is well-established that parties cannot amend their complaints through briefing or oral advocacy."  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  Here, Plaintiffs attempt through briefing to modify their Amended Complaint to allege the very opposite of what it now says.  Plaintiffs' Amended Complaint clearly alleges that the Secretary has already taken "final agency action" on the pertinent issue, Am. Compl. [Dkt. 37] ¶ 196, not that he has refused to take action on it. This is not, as Plaintiffs claim, a mere tweak of their legal

theory.  Plaintiffs cannot plead one set of facts in their Amended Complaint and expect the Court to rule on another.

While the Court might otherwise grant leave to amend, to do so here would be futile.  As discussed above, "airport purposes" is defined broadly in the Transfer Act to include any "business or activity not inconsistent with the needs of aviation[.]"  49 U.S.C. § 49104(a)(2)(A)(iv).  Plaintiffs make no serious effort to argue that MWAA's various projects fall outside this expansive definition.  Instead, Plaintiffs argue only that the Court should artificially narrow the definition of "airport purposes" to avoid "constitutional concerns" addressed and rejected above.  *See* Mem. in Supp. of Mot. for Summ. J. [Dkt. 47] at 27-28.  The Court declines to rewrite the statute in this manner.  Accordingly, Plaintiffs' APA claim against the federal defendants lacks merit whatever its formulation.

## IV. Conclusion

For the foregoing reasons, the Court finds that Plaintiffs' Amended Complaint fails to state a claim upon which relief may be granted.  Accordingly, the Court will deny Plaintiffs' Motion for Partial Summary Judgment [Dkt. 46], grant Defendants' Motions to Dismiss for Failure to State a Claim [Dkts. 85, 90, 94], deny Defendants' other Motions [Dkts. 86, 91] as moot, and dismiss Plaintiffs' Amended Complaint with prejudice.  Because the Court does not reach the question of

45

whether this matter should be dismissed pursuant to Federal Rule of Civil Procedure 19, the Court will deny Plaintiffs' Motion for Leave to File Supplemental Authority [Dkt. 127] as moot.

An appropriate order will issue.

 

|                        |                                     |
|------------------------|-------------------------------------|
|                        | /s/                                 |
| May 30, 2017           | James C. Cacheris                   |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE  |